Adam S. Heder, CSB #270946
adamh@hbclawyers.com
Harris Berne Christensen LLP
15350 SW Sequoia Parkway
Portland, OR 97224
Telephone: 503-968-1475
Fax: 503-968-2003
    Of Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **PETER JOHNSON**, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>  v.<br><br>**MAKER ECOSYSTEM GROWTH HOLDINGS, INC.**, a foreign corporation; **MAKER ECOSYSTEM GROWTH FOUNDATION,** a foreign corporation; and **DAI FOUNDATION**, a foreign corporation;<br><br>        Defendants. | Case No.<br><br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

      Lead Plaintiff, Peter Johnson, individually and on behalf of all others similarly situated, by his undersigned attorney, alleges the Defendants, three affiliated foreign companies that collectively operate, run, and manage the Maker Ecosystem, a cryptocurrency platform (the three entities, detailed more below, are collectively referred to herein as "Defendant" or "The Maker Foundation"). Lead Plaintiff's allegations herein are based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorney, which included, among others things, a review of

1 – Complaint

press releases, media reports, interviews, and other publicly disclosed reports and information about Defendant. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein, after a reasonable opportunity for discovery.

## SUMMARY OF ACTION

1. This is a class action lawsuit against The Maker Foundation. Despite representing that it manages a decentralized, open, digital currency platform that boasts overcollateralized (and therefore secure) currency and has certain measures in place to prevent significant investor loss, The Maker Foundation in fact has promoted a system that it maintains primary control and ownership over while actively misrepresenting to investors in its platform (or collateralized debt position holders, CDP Holders) the risks associated with it. The Maker Foundation has developed and now actively promotes the use of its digital currency, DAI, which it claims is more secure and stable than others because DAI are "over"-collateralized by other digital currency. Should the value of that collateral drop, The Maker Foundation assures its investors, then that triggers a liquidation event wherein the investor's collateral is auctioned off to pay off the outstanding DAI plus a modest, 13% liquidation penalty. Otherwise, however, a CDP Holder gets back the balance of their collateral. But on March 12, 2020 – what is now known as "Black Thursday" – the value of Ethereum, or ETH (a digital currency that is the primary collateral for DAI) dropped dramatically, triggering mass liquidation events for CDP Holders. But instead of triggering actual auctions that would have resulted in minimal, or at least mitigated, losses for its investors, The Maker Foundation's protocol instead triggered "pseudo auctions." During a 36-hour period spanning March 12-13, The Maker Foundation's protocol allowed two bots to continuously operate, buying up the liquidated CDP's collateral in lots of 50 ETH for zero-dollar bids. In other words, CDP Holders, despite being promised that auction and over-collateralization policies in

2 – Complaint

place would mitigate against dramatic drops in the value of collateral, instead lost 100% of the collateral they invested with The Maker Foundation. CDP Holders lost $8.325 million during this time of liquidation, which currently is worth over $11 million.

2. While misrepresenting to CDP Holders the actual risks they faced, The Maker Foundation neglected its responsibilities to its investors by either fostering or, at the very least, allowing the conditions that led to Black Thursday, all after actively soliciting millions of dollars of investment into its ecosystem.

3. The Lead Plaintiff files this complaint in order to compensate victims of The Maker Foundation's neglect and malfeasance that directly created the conditions leading to the $0 bid vulnerability that took place on Black Thursday.

## PARTIES

4. Lead Plaintiff Peter Johnson is an individual who at all times mentioned, was and is a resident of Denver, Colorado. Mr. Johnson was an early investor in ETH (dating back to March 2017) and actively participated in The Maker Foundation's software offerings; was among a handful of early Maker adopters and evangelists; became a CDP Holder himself in November 2018; and was entirely liquidated on Black Thursday when a singular bot bid on and won all of his remaining collateral for zero dollars. Mr. Johnson had 1713.7 ETH collateral locked up in a CDP with a liquidation price of $121.49 (worth $208,000 at the time of liquidation). Had the zero-bid auctions not occurred and had Maker made fair compensation on its 13% penalty, Mr. Johnson would have lost no less than 348 ETH of collateral (worth at least $42,000 at the time of the liquidation, or $54,600 today).

5. The Maker Foundation is a foreign company (organized and operating under the laws of the Cayman Islands), with its primary place of business in California.

6. Maker Ecosystem Growth Foundation is a foreign company (organized and operating under the laws of the Cayman Islands), with its primary place of business in California. On information and belief, Maker Ecosystem Growth Foundation is an affiliate of The Maker Foundation and overlaps in the management, operation, and development of the Maker Protocol (defined below) and its related ecosystem.

7. The DAI Foundation is a foreign company (organized and operating under the laws of Denmark), with its primary place of business in Denmark. On information and belief, the DAI Foundation is an affiliate of The Maker Foundation and overlaps in the management, operation, and development of the Maker Protocol and its related ecosystem.

8. The Maker Foundation, Maker Ecosystem Growth Foundation, and the DAI Foundation are agents of each other and in all respects relevant to the allegations herein, act on each other's behalf and jointly manage all material operations with respect to the management of the Maker Protocol and its related platform and ecosystem for the trading and mining of DAI. Each entity is collectively referred to herein as "Defendant" or "The Maker Foundation."

## JURISDICTION AND VENUE

9. This Complaint is filed, and these proceedings are instituted, to recover damages and to obtain other relief that the Lead Plaintiff and others similarly situated have sustained due to Defendant's misrepresentations and negligent maintenance of its cryptocurrency platform. The Lead Plaintiff brings common-law California state-law claims.

10. The Court has subject matter jurisdiction over this case because there is diversity of citizenship among the parties, and the amount in controversy, exclusive of costs and interests, exceeds $75,000.00. Accordingly, pursuant to 28 U.S.C. § 1332, the Court has subject matter jurisdiction over this case.

11. This Court has both general personal jurisdiction and specific personal jurisdiction over Defendant. As to general personal jurisdiction, Defendant has expressly represented that it does business out of San Francisco and Santa Cruz, California. Indeed, Defendant has expressly advertised that its headquarters are located 575 Market St. San Francisco, California 94105. Defendant's key officers and employees, including but not limited to the COO, the operations manager, and the head of marketing are based in and work out of either San Francisco or San Mateo counties in California. Accordingly, Defendant conducts a significant, if not majority, of its business throughout the state. Further, given that Defendant's marketing, including its head of marketing, is based in California, Defendant's specific acts of deception and misrepresentation and neglect, described more specifically below, occurred in California where Defendant operates.

12. Venue is proper in this case because, pursuant to 28 U.S.C. § 1391, this venue is where "a substantial part of the events or omissions giving rise to the claim occurred."

## INTRADISTRICT ASSIGNMENT

13. Pursuant to Civil L.R. 3-2(c), this action occurred in San Francisco County, California and should be assigned to the San Francisco Division.

## FACTUAL ALLEGATIONS

**I.  The Maker Protocol is a platform for collateralizing digital assets and "minting" and transacting in DAI – a unique cryptocurrency.**

14. The Maker Foundation is an organization that has developed a digital currency, DAI, and more importantly the protocol and various applications necessary for minting, collateralizing, and transacting the DAI. That protocol is called The Maker Protocol.

15. At its core, the Maker Protocol involves the collateralization of digital assets (such as cryptocurrencies like ETH) in order to create a "stable coin"—DAI—which is a "decentralized, unbiased, collateral-backed cryptocurrency soft-pegged to the US Dollar."

16. DAI is a store of value, a medium of exchange, a unit of account and a standard of deferred payment. And in practice, DAI is meant to be exchanged digitally between peers in exchange for other digital assets or services, just like US Dollars may be exchanged for goods and services.

**II.    The Maker Foundation boasts that it has created a decentralized cryptocurrency, which means that its currency (the DAI) is governed by its holders, not a central bank or other centralized financial institution.**

17. Among other things, The Maker Foundation created the Maker Decentralized Autonomous Organization (or MakerDAO), which enables holders of its governance token, MKR, to manage the MakerDAO organization "[t]hrough a system of scientific governance involving Executive Voting and Governance Polling . . . to ensure its stability, transparency, and efficiency." MKR are available to any willing buyers on any open markets that transact digital currency.

18. The Maker Foundation has boasted that it, together with the "global Maker community," is working "to bootstrap decentralized governance of the project and drive it toward complete decentralization."

19. In other words, MakerDAO is the governing body that sets all of the rules and regulations of the Maker platform, specifically the collateral debt position (or "CDP") terms. Those rules are "codified" as the Maker Protocol. If you transact in DAI, the rules of that currency are governed by MakerDAO (through the Maker Protocol). And because MakerDAO is comprised of MKR holders – which can be literally anyone or any entity – then MakerDAO, and therefore the governance of the Maker Protocol, is theoretically an open, decentralized, democratic platform. As discussed below, however, the truth is more complex than what The Maker Foundation has represented.

**III.    DAI is characterized by its collateralization, which The Maker Foundation has represented as a way to ensure the security of DAI-facilitated transactions.**

20. An important distinguishing characteristic of DAI is that it must be collateralized by another digital currency, primarily by ETH. An individual or entity wishing to transact in or otherwise procure DAI can either trade ETH (or other Ethereum tokens) directly for DAI through Maker's "Oasis" portal, purchase DAI with USD via cryptocurrency exchanges such as Coinbase, or create a collateralized debt position (CDP), thereby becoming a CDP Holder. That person wishing to procure DAI through a CDP may purchase $10,000 of ETH from an exchange, deposit that ETH into a CDP contract as collateral, from which that person is then able to borrow against their collateralized debt position by withdrawing DAI. How much ETH a person may leverage into DAI, however, is subject to the Maker Protocol's "liquidation ratio." The Maker Protocol's Liquidation Ratio is 150% of collateral to debt. Failure to maintain that ratio results in a "liquidation," described in more detail below.

21. By way of illustration: If an individual deposits $150 worth of ETH into a CDP, then, in order to maintain the 150% collateral-to-debt ratio, that same individual may borrow against that ETH only $100 worth of DAI. But of course, the value of ETH is dynamic and so, if the value of the ETH drops by 50% (thereby cutting the value of the person's $150 worth of ETH to $75 worth of ETH), then suddenly that person's $100 worth of outstanding DAI is under-collateralized, and a liquidation event is triggered.

22. As explained more below, the collateralization of the DAI, and this collateral-to-debt ratio, is crucial to the events at issue in this case and ultimately what led to a whole class of CDP Holders becoming liquidated. The $0 bid vulnerability that two bots took advantage of for 36 hours straight caused these CDP Holders to lose 100% of their initial investment, losing millions of dollars of value and investment.

    **IV.**    **The Maker Foundation touted its strict collateralization requirements as a way to ensure the security of DAI-centered transactions and as a way of mitigating investor risk.**

7 – Complaint

23. As noted, when the value of the collateral supporting a cache of DAI drops below the 150% described above, that automatically triggers a liquidation event.

24. The Maker Protocol utilizes a price-feed mechanism called "oracles"—price feeds provided by third parties and programs. These oracles monitor the price of ETH and thereby inform the Maker Protocol at large whether a given CDP Holder's DAI becomes undercollateralized. As soon as it does, liquidation is supposed to occur. And when liquidation happens, the CDP Holder's collateral—the ETH deposited into the CDP—is auctioned off to settle the debt with the Maker Protocol, with the balance of the ETH being returned to the CDP Holder.

25. Significantly, The Maker Foundation and other third-party user interfaces repeatedly advertised and represented to CDP Holders users that, because their CDPs would be significantly overcollateralized, liquidation events would *only result in a 13% liquidation penalty applied against the drawn DAI amount*, after which the remaining collateral would be returned to the user.

26. The Maker Foundation stated on its official Collateralized Debt Position Portal that "[i]f your CDP becomes liquidated, then there is a 13% liquidation penalty that will be subtracted when the locked collateral is sold."

27. To illustrate: A CDP Holder may have $1,000.00 in ETH collateralizing $500 in DAI. The price of ETH suddenly drops, however, bringing the value of the ETH to $700. That triggers a liquidation event, wherein the CDP Holder's ETH (valued at $700) is auctioned. The highest bidder, in this scenario, pays $700 for the ETH. That $700 is, in turn, used to first pay off the $500 in debt (i.e., the DAI), PLUS there is a 13% liquidation penalty. The CDP Holder gets to keep whatever remaining ETH there is (in this case, there would likely be some small amount of ETH leftover once The Maker Foundation is paid for the debt plus the 13% penalty fee).

V. **Yet, despite The Maker Foundation's many assurances of security,**

8 – Complaint

**transparency, and decentralization, the events of March 12, 2020, or "Black Thursday," lead to massive investor losses.**

28. In the early morning hours of March 12, 2020, the price of ETH dipped significantly and rapidly, dropping from over $190 the day before to a low of below $90 within several hours.

29. From 1:00 am Pacific Time to 5:00 am Pacific Time, ETH dipped from approximately $171 to under $130—a change of -23.5%.

30. As this significant dip accelerated, the Maker Protocol triggered liquidations for CDP that went below the requisite collateral-to-debt ratio of 150%.

31. Several issues affected the normal liquidation process, however.

32. First, the Maker Protocol's utilized oracles—again, price feeds provided by third parties and programs—failed to maintain accurate and updated prices, resulting in price reporting at levels much higher than the actual spot price of ETH.

33. Second, the crashing price caused extraordinarily high traffic on the Ethereum blockchain as parties attempted to transfer or sell their digital assets; the Ethereum network therefore experienced significant congestion and bottlenecking which slowed transactions by orders of magnitude. To push transactions through in a timely manner, therefore, parties were forced to spend upwards of ten times more than their usual transaction fees.

34. Third, and most disastrously, the Maker Protocol's lone process of CDP liquidation failed. Instead of automatically liquidating ETH held as collateral in CDPs through liquid markets and subtracting the 13% liquidation fee, the Maker Protocol had established a system of auctions whereby CDPs that had fallen below the requisite 150% collateral-to-debt ratio would have their ETH sold in lots of 50 to bidders participating on the Maker Protocol. The Maker Foundation severely limited who could participate as "Keepers" in those auctions however, restricting them to coded algorithms – often referred to as "bots" – which could programmatically patrol distressed

CDPs, trigger liquidation, and then bid on the remaining collateral. Keepers are "persons" who run these liquidation-specific "bots" on the Maker Protocol. In theory, such auctions would result in multiple Keepers operating bots making bids on the liquidated collateral, encouraging the best price to prevail. But during the flash crash of March 12 and 13 and its resultant network congestion, only four Keepers (running multiple bots) were active. The Maker Foundation operated one of the four Keeper bots, which immediately ran into technical issues and wasn't able to operate. The majority of the other Keeper bots quickly ran out of DAI liquidity and were frozen out of bidding for several hours. This left only two bots participating in all the remaining bids. Those two remaining bots, however, were programmed to increase their paid transaction fees according to the relative network congestion and were able to successfully place numerous $0 bids on liquidated ETH collateral; these two successful Keeper bots made opening bids of $0.00 on multiple auctions and, because they were the lone bidders on separate CDP auctions, won hundreds of auctions at no cost.

35. In other words, in contrast with Defendant's representations that in the event of liquidation there would be only a 13% penalty applied against the drawn DAI amount (with a return of all remaining collateral), CDP owners lost 100% of their collateral. Their investments became, in an instant, nothing.

36. At least one researcher concluded that, out of 3,994 liquidation transactions, 1,462 of them (36.6%) were realized with a 100 percent discount, and cumulative losses from these zero-dollar auctions amounted to $8.325 million.

VI. **The Maker Foundation's own neglect and malfeasance led to the events of Black Thursday, which could have and should have been avoided.**

37. The Maker Foundation envisioned this very scenario in its December 2017 whitepaper when it noted that "[a] number of unforeseen events could potentially occur" related

to "[p]ricing errors, irrationality and unforeseen events," noting that "[t]he Maker community will need to incentivize a sufficiently large capital pool to act as Keepers of the market in order to maximize rationality and market efficiency and allow the Dai supply to grow at a steady pace without major market shocks."

38. Despite that foresight over two years prior, The Maker Foundation did little or nothing to sufficiently incentivize the creation and maintenance of adequate Keepers.

39. Worse, The Maker Foundation allowed for highly suspicious changes to the Maker Protocol; specifically during the coding process, the Maker Protocol was adjusted multiple times from an auction window of three hours down to one hour (June 26, 2019), and then from one hour down to only ten minutes (October 1, 2019), allowing for even less fair market bidding.

40. With that change in place, Keepers which placed $0.00 bids on ETH collateral were uncontested and therefore successful due to high network congestion and the difficulty of having transactions mined. In short, the newly abbreviated window prevented anyone but specifically programmed, bespoke Keeper bots, from participating in a meaningful auction, thereby ensuring that these Keepers (owners of these custom bots) earned a windfall from the auctions and the CDP holders were left with nothing.

41. Further, The Maker Foundation tightly controls the process of programming and deploying a Keeper bot, which had produced the only model code to program and deploy a bot, leading to an unacceptably low number of Keepers patrolling the liquidation auctions.

**VII.   The Maker Foundation had, however, expressly advertised its services as being immune from the exact type of threats presented by the zero-bid auctions.**

42. On or around July 26, 2019, The Maker Foundation partnered with Coinbase—the United States' premiere cryptocurrency and digital asset exchange—to launch a tutorial for users called the "Dai Advanced Task."

43. In the Dai Advanced Task, Coinbase users were gifted .01 ETH (roughly $2.00 at the time) and taught how to generate Dai by opening a CDP with Maker through The Maker Foundation's CDP Portal.

44. In a single weekend, the Dai Advanced Task took CDP generation from 9,000 CDPs in the previous 11 months to "over 10,000 CDPs" opened in one weekend.

45. With that unprecedented burst in user activity and training from the Dai Advanced Task, the Maker Protocol never informed CDP Holders that the entirety of the CDPs could be forfeited. Rather, in all materials presented to CDP creators, The Maker Foundation and other third-party user interfaces informed users that, because their CDPs would be significantly overcollateralized, liquidation events would only result in a 13% liquidation penalty applied against the drawn DAI amount, after which the remaining collateral would be returned to the user.

46. Worse, The Maker Foundation prioritized and covered its own losses before those of the Lead Plaintiff and other similarly situated CDP Holders. Mere days after Black Thursday, The Maker Foundation began the process of minting and auctioning off new MKR to cover debts that were undercollateralized as a result of the zero-dollar exploit, a process which undeniably inured to the benefit of MKR holders.

47. In summary, The Maker Foundation developed and maintained a system that ensured its interests were protected (and in fact enhanced) before any of its investors. While CDP Holders lost millions of dollars in investment, The Maker Foundation enhanced and lined its own pockets with liquidation penalties and collateral auctions.

**VIII. Remarkably, in fact, The Maker Foundation has acknowledged that it failed to properly message the risks of holding CDP, that it was aware of those risks (despite its public representations), and that its messaging was flat-out wrong and misleading.**

48. In their March 24, 2020 Governance and Risk meeting, Maker Foundation members—led by Richard Brown, Maker Foundation's Head of Core Community—addressed Black Thursday specifically, and admitted that they had not messaged the risks to CDP Holders that liquidation of CDPs could result in a total loss of collateral (rather than the 13% liquidation penalty).

49. The call participants—some named, others anonymous—also opined that Black Thursday, and specifically the zero-dollar bid exploit, was the result of nefarious actors who had extensive, highly intelligent knowledge of the Maker Protocol, suggesting that the Keeper programmers were intimately familiar with and associated with the broader Maker community.

50. Several call members dismissed concerns with the Protocol, failure to message risks, and the perceived negligence on the part of The Maker Foundation, but did note that the philosophy and the optics of Black Thursday weren't "fantastic," and that compensating effected CDP Holders wouldn't be "that big of a deal" given the relatively low amount of damages at stake.

**IX. Further, despite its proclamation of an open, decentralized platform, The Maker Foundation still manages the Maker Protocol, maintains every financial incentive to attract more CDP Holders (and their capital), and continues to "run the show."**

51. From its inception, every material application, component, and feature of the Maker Protocol has been designed and controlled by The Maker Foundation.

52. In its December 2017 White Paper, The Maker Foundation admitted its crucial and central role in the Maker Protocol, stating that

> The Maker Team plays a major role in the development and governance of the Maker Platform in its early days: budgeting for expenses, hiring new developers, seeking partnerships and institutional users, and interfacing with regulators and other key external stakeholders. Should the Maker Team fail in some capacity—for legal reasons, or due to internal problems with management—the future of Maker could be at risk without a proper backup plan.

53. Beginning in 2016, The Maker Foundation began selling the Maker Protocol

governance token MKR through its forum and in private deals, and later through sell orders on third party exchanges as well as its own.

54. Among other features, the MKR token promises to reward MKR holders, who are effectively paid the interest from CDPs and a portion of liquidation fees collected.

55. Since its formation, The Maker Foundation has solicited and received investment from multiple entities since its formation, including 1confirmation, Polychain Capital, Andreesen Horowitz, Distributed Capital Partners, Scanate, FBG Capital, Wyre Capital, Walden Bridge Capital.

56. In a statement made in 2017 and published on the social media website Reddit, Rune Christensen—CEO of The Maker Foundation—stated that "we sold about 25% [of MKR] and gave about 20% as salary."

57. In December 2019 sold 5.5% of the MKR token supply to Dragonfly Capital Partners and Paradigm for $27.5 million, still leaving at least a plurality, if not a majority, of MKR in the hands of The Maker Foundation and its agents and employees.

58. Despite those sales, and on information and belief, The Maker Foundation—whether as an entity or together with its officers, employees, and members—still owns and controls a majority of the MKR Tokens.

59. And as explained above and as further evidence of this, The Maker Foundation prioritized and covered its own losses before those of the Lead Plaintiff and other similarly situated CDP Holders.  Mere days after Black Thursday, The Maker Foundation began the process of minting and auctioning off new MKR to cover debts that were undercollateralized as a result of the zero-dollar exploit, a process which undeniably inured to the benefit of MKR holders.

## CLASS ACTION ALLEGATIONS

60. Lead Plaintiff brings this action as a class action pursuant to rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class of persons:

> All persons or entities who held CDP on any Maker-run exchanges that were forced to liquidate their ETH and received zero compensation at auction.

61. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes there are over one thousand of members in the proposed Class.

62. The Class is readily ascertainable and identifiable via the blockchain itself. In fact, each and every CDP that was opened can be determined with perfect precision through the same blockchain.

63. Lead Plaintiff will fairly and adequately protect the interest of the Class because Lead Plaintiff's claims are typical and representative of the claims of all members of the Class. Lead Plaintiff suffered injury in fact when he lost no less than 348 ETH of collateral (worth at least $42,000 at the time of the liquidation, or $54,600 today).

64. Lead Plaintiff's claims are typical of the claims of all Class members, as all members of the Class are similarly affected by the events of "Black Thursday," only the amount of loss distinguishing each.

65. There are no unique defenses that may be asserted against Lead Plaintiff individually, as distinguished from the other members of the Class, and the relief sought is common to the Class. Lead Plaintiff is typical of other members of the Class, does not have any interest that is in conflict with or is antagonistic to the interests of the members of the Class, and has no conflict with any other members of the Class.

66. Lead Plaintiff has retained competent counsel to represent him and the Class.

67. Questions of law and fact common to the Class that predominate over any questions that may affect only individual members of the Class, include but are not limited to:

   a. Whether Defendant misrepresented, intentionally or negligently, the consequences of a liquidation event on one of its exchanges;

   b. Whether Defendant misrepresented, intentionally or negligently, its own interest or involvement in the Keepers and therefore, its own interest in the liquidation events;

   c. Whether Defendant's conduct was negligent

   d. The type and measure of damages suffered by Lead Plaintiff and the Class.

68. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to redress individually the wrongs done to them. In the absence of a class action, Defendant will retain the benefits of its wrongful conduct.

## FIRST CLAIM FOR RELIEF

### Negligence

69. Lead Plaintiff, on behalf of himself and all others similarly situated, realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint.

70. Defendant has a duty to CDP Holders to manage the Maker Protocol and its platform both as it has advertised and also in a reasonable, prudent, non-negligent manner.

71. By failing to prevent and/or actively allowing the events of the $0 bid exploit to continue for 36 hours straight during Black Thursday, as outlined in Paragraphs 37-41 above, Defendant breached that duty.

72. Defendant's breach of that duty, again as outlined in Paragraphs 37-41 above, was the direct cause of Lead Plaintiff's losses as described above.

73. And as described above, Lead Plaintiff was injured and lost money in the amounts described above in Paragraph 4.  The Class was injured and lost money in an amount to be proven at trial but not less than $8.325 million.

## SECOND CLAIM FOR RELIEF

### Intentional Misrepresentation

74. Lead Plaintiff, on behalf of himself and all others similarly situated, realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint.

75. Defendant misrepresented the nature of how liquidations would work, how liquidation penalties would work, and how liquidation auctions would work.

76. Defendant's misrepresentations were knowingly false.  Defendant was aware of the problems that existed within the Maker Protocol and the potential for exploitation.  Despite that, it continued to misrepresent the risks associated with a liquidation event.  Further, it did so in a way that minimized its own losses.  Defendant's subsequent statements regarding Black Thursday further confirm that it fully knew and understood the risks associated with liquidation events but actively misrepresented those risks nonetheless.

77. Lead Plaintiff relied on Defendant's representations when he purchased CDP, having been falsely assured that his purchases were subject to little risk and that, even in the event of liquidation, he would have the protection of a legitimate, bona-fide auction.

78. As a result of Defendant's misrepresentations, Lead Plaintiff was injured and lost money in the amounts described above in paragraphs 4. The Class was injured and lost money in an amount to be proven at trial but not less than $8.325 million.

79. Defendant's behavior was intentional and fraudulent. Defendant intentionally misrepresented the risks associated with CDP ownership. Lead Plaintiff and the Class are, as a result, entitled to punitive damages in an amount to be proven at trial, but not less than $20 million.

### THIRD CLAIM FOR RELIEF

#### Negligent Misrepresentation

80. In the alternative, Lead Plaintiff, on behalf of himself and all others similarly situated, realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint and allege this claim for negligent misrepresentation.

81. Defendant misrepresented the nature of how liquidations would work, how liquidation penalties would work, and how liquidation auctions would work.

82. Defendant could not have had any reasonable ground for believing the foregoing representations were true. The events of Black Thursday immediately exposed numerous defects within the Maker Protocol, whether those were intentional or simply negligent. Thus, Defendant could not have reasonably stress-tested or otherwise concluded that its representations regarding auction events were immune from the zero-bid auctions that occurred *en masse* on Black Thursday. misrepresentations were knowingly false. Indeed, Defendant was aware of the problems that

existed within the Maker Protocol and the potential for exploitation, as outlined in Paragraphs 37-50.

83. Lead Plaintiff relied on Defendant's representations when he purchased CDP, having been falsely assured that his purchases were subject to little risk and that, even in the event of liquidation, he would have the protection of a legitimate, bona-fide auction.

84. As a result of Defendant's misrepresentations, Lead Plaintiff was injured and lost money in the amounts described above in paragraphs 4. The Class was injured and lost money in an amount to be proven at trial but not less than $8.325 million.

WHEREFORE, Plaintiff prays that the Court grant it the following relief against Defendant:

A. As to the First Claim for Relief, Negligence, damages in an amount to be proven at trial but not less than $8.325 million.

B. As to the Second Claim for Relief, Intentional Misrepresentation, damages in an amount to be proven at trial but not less than $8.325 million, plus punitive damages in an amount not less than $20 million.

C. As to the Third Claim for Relief, Negligent Misrepresentation, damages in an amount to be proven at trial but not less than $8.325 million.

D. As to all causes of action, pre- and post-judgment interest;

E. Costs; and

F. Any other relief available at law or equity.

DATED April 14, 2020.                    **HARRIS BERNE CHRISTENSEN LLP**

By: s/ Adam S. Heder
Adam S. Heder, CSB #270946
Of Attorneys for Lead Plaintiff

19 – Complaint