PETER B. MORRISON (SBN 230148)
peter.morrison@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
300 South Grand Avenue, Suite 3400
Los Angeles, California 90071-3144
Telephone: (213) 687-5000
Facsimile:  (213) 687-5600

ALEXANDER C. DRYLEWSKI (*admitted pro hac vice*)
alexander.drylewski@skadden.com
MICHAEL W. RESTEY JR. (*admitted pro hac vice*)
michael.restey@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Facsimile:  (212) 735-2000

*Attorneys for Defendants*
MAKER ECOSYSTEM GROWTH
HOLDINGS, INC. AND MAKER
ECOSYSTEM GROWTH FOUNDATION

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| PETER JOHNSON, individually and on behalf of all others similarly situated,<br><br>                                    Plaintiff,<br><br>          v.<br><br>MAKER ECOSYSTEM GROWTH HOLDINGS, INC., a foreign corporation; MAKER ECOSYSTEM GROWTH FOUNDATION, a foreign corporation; and DAI FOUNDATION, a foreign corporation,<br><br>                                    Defendants. | Case No.: 3:20-cv-02569-MMC<br><br>**(1) THE MAKER DEFENDANTS' NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF;**<br><br><u>**SEPARATE COVER:**</u><br><br>**(2) DECLARATION OF STEVEN BECKER IN SUPPORT OF MOTION TO COMPEL ARBITRATION;**<br><br>**(3) [PROPOSED] ORDER;**<br><br>**(4) REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO COMPEL ARBITRATION;**<br><br>**(5) DECLARATION OF PETER B. MORRISON IN SUPPORT THEREOF; and**<br><br>**(6) [PROPOSED] ORDER.**<br><br>Date:          October 2, 2020<br>Time:          9:00 a.m.<br>Courtroom:  7<br>Judge:        Hon. Maxine M. Chesney |

# **TABLE OF CONTENTS**

**Page**

NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION ...................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................ 2

PRELIMINARY STATEMENT ................................................................................................... 2

BACKGROUND ........................................................................................................................... 4

I.     THE MAKERDAO PLATFORM ............................................................................ 4

II.    PLAINTIFF ASSENTED TO THE TERMS OF SERVICE ..................................... 6

III.   THE TERMS OF SERVICE CONTAIN AN INDIVIDUAL
ARBITRATION PROVISION ................................................................................ 7

IV.   PLAINTIFF FILES THE INSTANT ACTION IN DEROGATION OF THE
TERMS OF SERVICE ............................................................................................ 8

ARGUMENT ................................................................................................................................. 8

I.     THE COURT SHOULD GRANT THE MAKER DEFENDANTS'
MOTION TO COMPEL ARBITRATION .............................................................. 8

     A.    Plaintiff Affirmatively Assented to the Terms of Service ............................. 9

     B.    The Arbitrator Should Decide All Questions Regarding the Scope of
Arbitrability ................................................................................................ 12

     C.    The Maker Defendants Can Enforce the Arbitration Provision .................... 13

          1.    Plaintiff's claims rely upon and are interwoven with the
Terms of Service ............................................................................. 14

          2.    The relationship between the Maker Defendants and
Plaintiff's allegations provides another basis for enforcing the
arbitration provision ........................................................................ 17

II.    THE CASE SHOULD BE DISMISSED PENDING ARBITRATION ................... 18

# TABLE OF AUTHORITIES

**Page**

## CASES

*Airtourist Holdings LLC v. HNA Group*,
  No. C 17-04989 JSW, 2018 WL 3069444 (N.D. Cal. Mar. 27, 2018) .......................... 13, 16

*Allied-Bruce Terminix Cos. v. Dobson*,
  513 U.S. 265 (1995)................................................................................................................. 8

*Amisil Holdings Ltd. v. Clarium Capital Management*,
  622 F. Supp. 2d 825 (N.D. Cal. 2007) ..................................................................... 4, 14, 17

*Arthur Andersen LLP v. Carlisle*,
  556 U.S. 624 (2009)............................................................................................................... 13

*AT&T Mobility LLC v. Concepcion*,
  563 U.S. 333 (2011)............................................................................................................. 2, 9

*Brennan v. Opus Bank*,
  796 F.3d 1125 (9th Cir. 2015) .......................................................................................... 3, 9, 13

*Brown v. Dow Chemical Co.*,
  No. 18-cv-07098-MMC, 2019 WL 484211 (N.D. Cal. Feb. 7, 2019) .................................... 9

*Caviani v. Mentor Graphics Corp.*,
  No. 19-cv-01645-EMC, 2019 WL 4470820 (N.D. Cal. Sept. 18, 2019) ......................... 3, 12

*Chiron Corp. v. Ortho Diagnostic Systems, Inc.*,
  207 F.3d 1126 (9th Cir. 2000) ............................................................................................... 9

*Cordas v. Uber Technologies, Inc.*,
  228 F. Supp. 3d 985 (N.D. Cal. 2017) ......................................................................... 3, 9, 12

*Daniels v. Painter*,
  No. CV 16-03782-RSWL-Ex, 2016 WL 11498957 (C.D. Cal. Sept. 16, 2016) ................. 15

*Franklin v. Community Regional Medical Center*,
  No. 1:19-cv-00709-SKO, 2019 WL 6701298 (E.D. Cal. Dec. 9, 2019),
  *appeal filed*, No. 19-17570 (9th Cir. Dec. 24, 2019) ......................................................... 16

*Garcia v. Pexco, LLC*,
  11 Cal. App. 5th 782 (2017) ................................................................................................ 16

*GE Energy Power Conversion Fr. SAS, Corp. v. Outokumpu Stainless USA, LLC*,
  140 S. Ct. 1637 (2020)..................................................................................................... 13, 14

*Healy v. RBC Dain Rauscher*,
  No. C 04-4873MMC, 2005 WL 387140 (N.D. Cal. Feb. 17, 2005)................................... 2, 9

*Holl v. United States District Court (In re Holl)*,
  925 F.3d 1076 (9th Cir. 2019) ........................................................................................... 9, 10

ii

*Holl v. United Parcel Service, Inc.*,
    Case No. 16-cv-05856-HSG, 2017 WL 11520143 (N.D. Cal. Sept. 18,
    2017) ................................................................................................................ 10, 11, 12

*Hopkins & Carley, ALC v. Thomson Elite*,
    No. 10-CV-05806-LHK, 2011 WL 1327359 (N.D. Cal. Apr. 6, 2011) .......................... 4, 18

*Kaselitz v. hiSoft Technology International, Ltd.*,
    No. C-12-5760 MMC, 2013 WL 622382 (N.D. Cal. Feb. 15, 2013) .................... 4, 9, 14, 17

*La Force v. GoSmith, Inc.*,
    No. 17-cv-05101-YGR, 2017 WL 9938681 (N.D. Cal. Dec. 12, 2017).............. 3, 10, 11, 12

*Larson v. Speetjens*,
    No. C 05-3176 SBA, 2006 WL 2567873 (N.D. Cal. Sept. 5, 2006),
    *order clarified*, No. C 05-3176 SBA, 2006 WL 3365589 (N.D. Cal. Nov. 17, 2006) ......... 15

*Lucas v. Hertz Corp.*,
    875 F. Supp. 2d 991 (N.D. Cal. 2012) ................................................................................. 16

*McLellan v. Fitbit, Inc.*,
    Case No. 3:16-cv-00036-JD, 2018 WL 1913832 (N.D. Cal. Jan. 24, 2018) ....................... 10

*Metalclad Corp. v. Ventana Environmental Organizational Partnership*,
    109 Cal. App. 4th 1705 (2003) .......................................................................................... 17

*Meyer v. Uber Technologies, Inc.*,
    868 F.3d 66 (2d Cir. 2017)............................................................................................ 11, 12

*Nevarez v. Forty Niners Football Co.*,
    Case No. 16-CV-07013, 2017 WL 3492110 (N.D. Cal. Aug. 15, 2017)....................... 10, 18

*Peter v. DoorDash, Inc.*,
    No. 19-cv-06098-JST, 2020 WL 1967568 (N.D. Cal. Apr. 23, 2020) ................................ 10

*Republic of Nicaragua v. Standard Fruit Co.*,
    937 F.2d 469 (9th Cir. 1991) ............................................................................................... 9

*Sparling v. Hoffman Construction Co.*,
    864 F.2d 635 (9th Cir. 1988) ............................................................................................. 18

*Wamar International, LLC v. Thales Avionics, Inc.*,
    Case No. SA CV 18-2217-DOC (KES), 2019 WL 1877615 (C.D. Cal. Mar. 20,
    2019) .................................................................................................................................. 15

**STATUTES**

9 U.S.C. § 2 ................................................................................................................ 1, 2, 8

9 U.S.C. § 4 ........................................................................................................................... 9

**OTHER AUTHORITIES**

AAA Consumer Arbitration Rules, R–14(a) ............................................................... 7, 13

iii

1

## NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION

2    **PLEASE TAKE NOTICE** that at 9:00 a.m. on October 2, 2020, or as soon thereafter as

3   the matter may be heard, in the courtroom of the Honorable Maxine M. Chesney, located at 450

4   Golden Gate Avenue, Courtroom 7, 19th Floor, San Francisco, California 94102, Defendants

5   Maker Ecosystem Growth Holdings, Inc. ("MEGH") and Maker Ecosystem Growth Foundation

6   ("MEGF") (together, the "Maker Defendants") will and hereby do move this Court, pursuant to the

7   Federal Arbitration Act ("FAA"), 9 U.S.C. § 2, to compel arbitration of the claims brought by

8   Plaintiff Peter Johnson ("Plaintiff").

9

## RELIEF REQUESTED

10    Defendants seek an order compelling Plaintiff to arbitrate his claims on an individual basis

11   because Plaintiff is subject to a contractually-mandated arbitration provision.

12    This Motion is based on this Notice of Motion and Motion to Compel Arbitration, the

13   Memorandum of Points and Authorities, the Request for Judicial Notice in Support of the Maker

14   Defendant's Motion to Compel ("RJN"), the Declaration of Steven Becker ("Becker Decl."),

15   accompanying exhibits in support thereof, the record in this action and such further evidence and

16   argument that this Court may consider.

17

18

19

20

21

22

23

24

25

26

27

28

1

## MEMORANDUM OF POINTS AND AUTHORITIES

## PRELIMINARY STATEMENT

Plaintiff opened his MakerDAO account in November 2018.  As a precondition to opening the account, Plaintiff checked a box stating that he read and accepted the 2018 Terms of Service governing his use of the platform (the "Terms of Service").  The Terms of Service expressly require Plaintiff to individually arbitrate any and all claims arising thereunder, including disputes like this one, which arise from his alleged use of the platform.  In bringing this putative class action, Plaintiff ignores his promise to pursue his claims through arbitration, failing to mention the arbitration agreement to which he affirmatively agreed.  Accordingly, Defendants move this Court to compel arbitration.

Under the Federal Arbitration Act, an arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.  Courts routinely apply the "liberal federal policy favoring arbitration" when assessing motions to compel like this one.  *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011); *see also Healy v. RBC Dain Rauscher*, No. C 04-4873MMC, 2005 WL 387140, at \*2 (N.D. Cal. Feb. 17, 2005) (Chesney, J.) (Federal Arbitration Act "establishes a 'federal policy favoring arbitration' and requires federal courts to 'rigorously enforce agreements to arbitrate.'"). The Court should hold Plaintiff to his agreement to arbitrate under the Terms of Service and grant the Maker Defendants' motion.

**Plaintiff assented to the Terms of Service (*infra* Section I.A.)**.  First, it is indisputable that when Plaintiff chose to use the MakerDAO platform and open his account, he assented to the Terms of Service by affirmatively clicking a check box, to the right of which appeared the phrase: "*I have read and accept the Terms of Service*."  (Becker Decl. ¶ 7; Ex. B.)[1]  The words "***Terms of Service***" were hyperlinked, permitting Plaintiff to review all of the terms he was accepting, including the clear provision requiring him to resolve any disputes arising under the Terms of

---

[1]   Citations to "Becker Decl." are citations to the Declaration of Steven Becker in Support of the Maker Defendants' Motion to Compel Arbitration, dated July 15, 2020, filed concurrently herewith.

1  Service "in binding arbitration, on an individual basis."  (*Id.* ¶¶ 7, 11; Ex. A.)  Courts routinely

2  uphold this type of "clickwrap" agreement under California law.  *See, e.g.*, *La Force v. GoSmith,*

3  *Inc.*, No. 17-cv-05101-YGR, 2017 WL 9938681, at *1 (N.D. Cal. Dec. 12, 2017).

4      **Arbitrability has been delegated to the arbitrator (*infra* Section I.B.)**.  Second, having

5  established Plaintiff's affirmative assent to the Terms of Service, those terms delegate any

6  questions of arbitrability to the arbitrator rather than the courts.  Where "a signed arbitration

7  agreement includes a reference to specific arbitration rules—*e.g.*, AAA, JAMS, etc.—the Ninth

8  Circuit has held that the parties agreed to delegate arbitrability itself to the arbitrator."  *Caviani v.*

9  *Mentor Graphics Corp.*, No. 19-cv-01645-EMC, 2019 WL 4470820, at *4 (N.D. Cal. Sept. 18,

10  2019); *see also Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015).  Here, the Terms of

11  Service specifically provide that the American Arbitration Association's ("AAA") rules for

12  arbitration of consumer-related disputes will apply to all disputes arising thereunder.  (Becker Decl.

13  ¶ 11; Ex. A.)  The AAA rules, in turn, state that the arbitrator must decide all issues of arbitrability,

14  including whether Plaintiff's claims fall within the scope of his agreement to arbitrate.

15  Accordingly, under the FAA, this Court should not (and indeed cannot) decide whether Plaintiff's

16  claims fall within the scope of the arbitration agreement (though they do).  Rather, the AAA

17  arbitrator must answer that question in the first instance.  *See Cordas v. Uber Techs., Inc.*, 228 F.

18  Supp. 3d 985, 992 (N.D. Cal. 2017) ("Because the parties agreed to arbitrate . . . and agreed to

19  delegate questions of arbitrability to an arbitrator, the remaining questions of whether the

20  arbitration agreement is valid and whether it encompasses this dispute are delegated to an

21  arbitrator.").

22      **The Maker Defendants can enforce the Terms of Service (*infra* Section I.C.)**.  Third,

23  the Maker Defendants can enforce the arbitration provision.  Plaintiff opened his account less than

24  a month before certain MakerDAO-related entities were reorganized and shortly before the Maker

25  Defendants adopted additional Terms of Service specifically identifying Defendant Maker

26  Ecosystem Growth Holdings, Inc. ("MEGH") as a party.  (Becker Decl. ¶¶ 12, 13.)  As a result,

27  Plaintiff assented to the Terms of Service prior to the creation of the Maker Defendants and before

28  the new terms of service specifically identified MEGH as a signatory.  (*Id.*)  Under the well-

3

established doctrine of equitable estoppel, such technicalities cannot prevent non-signatories from enforcing the terms of an agreement to arbitrate where (i) the signatory's claims rely upon or are intertwined with the underlying agreement, or (ii) the signatory alleges concerted misconduct by a non-signatory and another signatory. *Amisil Holdings Ltd. v. Clarium Capital Mgmt.*, 622 F. Supp. 2d 825, 840 (N.D. Cal. 2007); *see also Kaselitz v. hiSoft Tech. Int'l, Ltd.*, No. C-12-5760 MMC, 2013 WL 622382, at *7 (N.D. Cal. Feb. 15, 2013) (Chesney, J.). That doctrine applies with full force here.

Plaintiff's claims undoubtedly are intertwined with the Terms of Service, which govern Plaintiff's entire use of the MakerDAO platform upon which his claims are based. For example, while Plaintiff alleges that he was not warned about the risks of using the MakerDAO platform, the Terms of Service to which Plaintiff affirmatively agreed contain explicit warnings about those very risks. (Becker Decl. ¶ 9; Ex. A.) The MakerDAO website also contains conspicuous language directing users to the Terms of Service for a complete discussion of the risks involved in using the platform. (*Id.* ¶ 8.) Moreover, Plaintiff's Complaint routinely attributes to the Maker Defendants statements appearing on the Maker "CDP Portal," through which Plaintiff created his account and agreed to the Terms of Service and arbitration provision. In light of Plaintiff's own allegations, as well as the indisputable fact that Plaintiff committed to arbitrate any claims arising from his use of the MakerDAO platform, Defendants may enforce the arbitration agreement.

**This Court should dismiss this action (*infra* Section II).** Finally, where arbitration is mandatory and all claims are subject to arbitration, as here, the Court should dismiss the action. *See Hopkins & Carley, ALC v. Thomson Elite*, No. 10-CV-05806-LHK, 2011 WL 1327359, at *8 (N.D. Cal. Apr. 6, 2011).

**BACKGROUND**

## I.     THE MAKERDAO PLATFORM

The MakerDAO platform is an open-source, community-organized project that aims to provide stability and equality of access to the global financial system through the use of

1  decentralized blockchain technology.  (Becker Decl. ¶ 3.)[2]  Users can generate a digital currency,

2  called DAI, by opening an account called a Collateralized Debt Position ("CDP") on the platform.

3  (*Id.*)[3]  DAI is a so-called "stablecoin" because its value is soft-pegged to the U.S. Dollar in order to

4  maintain a stable price and function as a true currency.  (*Id.*)  MakerDAO users generate DAI by

5  locking another cryptocurrency, such as Ether ("ETH"), into the CDP as collateral.  (*Id.* ¶ 4.)  Once

6  ETH is locked into a CDP, users can generate DAI tokens in return, which they can then use as

7  they would other currencies.  (*Id.*)  Users worldwide can create CDPs through a website by

8  agreeing to the Terms of Service.  (*Id.* ¶ 6.)

9        The platform users are required to over-collateralize their CDPs (for example, by locking

10  ETH worth 150% of the amount of DAI generated).  (Becker Decl. ¶ 4.)  If a user's

11  collateralization level drops below a certain threshold, the system can trigger an auction of the ETH

12  held as collateral in order to cover that user's outstanding DAI and incurred fees.  (*Id.*)[4]  Plaintiff

13  alleges that on March 12, 2020, which he calls "Black Thursday," a series of sudden market events

14  occurred that caused the value of ETH to fall precipitously, thus triggering the auction process for a

15  number of CDPs and, ultimately, allowing certain third-party actors to obtain users' locked ETH

16  through the auction process at below market prices.  (Compl. ¶ 1.)[5]  Despite the open-source nature

17  of the system's protocol and repeated risk warnings provided to all users of the platform, Plaintiff

18  asserts claims for negligence and misrepresentation against the Maker Defendants for purportedly

19

20

21

22  [2]    Generally speaking, a "blockchain platform" is a peer-to-peer network that records and reflects
    all transactions on a publicly viewable and unalterable system.  A "decentralized" network is one
23  that does not have any central governance, authority or management, but rather a dispersed group
    of network users governs and maintains the network.  "Open-source" means that the system's code
    is publicly available and entirely transparent.

24

25  [3]    CDPs are now known as "Vaults," and the two terms are used interchangeably herein.  (Becker
    Decl. ¶ 4 n.1.)

26  [4]    These fees include (i) a Stability Fee that is paid by CDP holders to maintain the CDP, and (ii)
    a Liquidation Fee that is payable if and when a CDP is liquidated pursuant to the auction process.
27  (Becker Decl. ¶ 4 n.2.)

28  [5]    References to "Compl." or "Complaint" refer to the First Amended Complaint filed by Plaintiff
    on May 8, 2020.

1    failing to warn him that unknowable market events like those allegedly taking place on "Black

2    Thursday" could occur.

3    **II.    PLAINTIFF ASSENTED TO THE TERMS OF SERVICE**

4            Plaintiff opened his CDP account on November 29, 2018.  (Becker Decl. ¶ 6.)  At that time,

5    the website required users to click a check box directly to the left of the words "***I have read and***

6    ***accept the Terms of Service***" before they could create an account.  (*Id*. ¶ 7.)  The words "***Terms of***

7    ***Service***" were conspicuously hyperlinked to the Terms of Service to allow users to review the

8    terms to which they were agreeing.  (*Id*. ¶ 7.)

9            A user could not complete the process of opening a CDP without first accepting the Terms

10   of Service.  (Becker Decl. ¶ 7, Ex. B.)  In fact, prior to accepting the Terms of Service, the button

11   that reads "FINALIZE AND CREATE CDP" was not clickable.  (*Id*.)  Only once users checked the

12   box affirming that they had read and accepted the Terms of Service would the box become

13   clickable and allow users to open an account and create a CDP in order to generate DAI.  (*Id*.)

14           The Terms of Service are available on the MakerDAO CDP Portal and have been posted

15   there since May of 2018.  (Becker Decl. ¶ 6.)[6]  The homepage of the CDP Portal contains an

16   express link to the Terms of Service, and explicitly directs potential users to the Terms of Service,

17   stating "*[s]ee the Terms of Service for risks involved*."  (*Id*. ¶ 8.)  The Terms of Service contain

18   numerous statements regarding the risks associated with using the platform and purchasing or

19   generating DAI.  (*See id*. Ex. A.)  Indeed, the Terms of Service repeatedly warn that users must

20   agree to the Terms of Service *before* they can use the platform.  (*See id.* at 1 ("If you do not agree

21   to the Terms, then you **may not** access or use the Content or Service.").)  The Terms of Service

22   required users to represent that they were sophisticated parties with comprehensive technical

23   knowledge of cryptography and "underst[ood] the inherent risks associated with cryptographic

24   systems," including those "which could result in the theft or loss of your cryptographic tokens or

25   property."  (*Id.* at 3-6.)

26

27   _____

28   [6]   In November 2019, the Maker Defendants launched an upgraded version of the platform, called
     multi-collateral DAI ("MCD"), which permits users to generate DAI with additional collateral
     types beyond ETH.  (Becker Decl. ¶ 5 n.3.)

### III.   THE TERMS OF SERVICE CONTAIN AN INDIVIDUAL ARBITRATION PROVISION

Section 12 of the Terms of Service is entitled "**Arbitration and Class Action Waiver**." (*See* Becker Decl. Ex. A at 9.)  Section 12.1 provides that users will make best efforts to settle any disputes through good faith negotiations.  (*See id.*)  If the dispute cannot be resolved by good faith negotiations, Section 12.2 of the Terms of Service provides that users "agree that any dispute arising under [the Terms of Service] shall be finally settled in binding arbitration, on an individual basis, in accordance with the [AAA's] rules for arbitration of consumer-related disputes."  (*See id.* at 9-10.)  Users were provided with a hyperlink to the AAA consumer rules directly following this clause.  (*Id.* at 10.)  The AAA rules, in turn, state that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim."  (AAA Consumer Arbitration Rules, R–14(a), *see* RJN, Ex. A.)

In Section 12.2 of the Terms of Service, users also expressly waive their right to trial by jury and their "right to participate in a class action lawsuit or a class-wide arbitration."  (Becker Decl. Ex. A at 10.)  Section 12.2 further delineates the procedure and location of the arbitration.  (*Id.*)

The Terms of Service expressly cover all users of the MakerDAO system as well as MakerDAO and "ALL PERSONS, ENTITIES, AGENTS, AND VOLUNTEERS INVOLVED WITH THE CREATION OF THE DAI SYSTEM AND SOFTWARE."  (*Id.* at 2-3.)  At the time Plaintiff created his CDP and assented to the Terms of Service, Stablecoin Liquidity Services, LLC ("SLS") was doing business as MakerDAO.  (Becker Decl. ¶ 12.)  As part of a subsequent corporate reorganization of SLS, Defendant MEGH was established on December 14, 2018, and Defendant MEGF was established on December 17, 2018.  (*Id.*)  SLS assigned various agreements to the Maker Defendants and ceased operations at that time, with the Maker Defendants assuming SLS's responsibilities and operations related to the community resources supporting the MakerDAO platform.  (*Id.*)  Following the reorganization, the Maker Defendants implemented the 2019 Terms of Service, which required new users creating an account on the MakerDAO system to accept that "[t]his agreement is between you . . . and Maker Ecosystem Growth Holdings, Inc."

7

(*Id.* ¶ 13.)  SLS also held the rights to the MakerDAO website and the CDP Portal subdomain on that website.  (*Id.* ¶ 14.)  During the corporate reorganization, MEGH assumed control of those sites and has maintained them since December 2018.  (*Id.*)  SLS's dissolution began in December 2018 and was completed by July 2019.  (*Id.*)

## IV.   PLAINTIFF FILES THE INSTANT ACTION IN DEROGATION OF THE TERMS OF SERVICE

On April 14, 2020, Plaintiff filed this putative class action in contravention of the Terms of Service and arbitration agreement that he represented to have read and accepted.  Plaintiff did not attempt to resolve his dispute through good faith negotiations prior to bringing suit and did not bring his claims in arbitration, as the Terms of Service require.  (Becker Decl. ¶ 16.)  The Complaint sets forth three claims—for negligence, negligent misrepresentation and intentional misrepresentation—all of which concern and arise from Plaintiff's use of the MakerDAO system and Defendants' purported representations regarding risks associated with its use.  (Compl. ¶¶ 69-84.)

Following the institution of this action, the Maker Defendants requested that Plaintiff consent to pursuing his claims in arbitration.  Plaintiff refused, contending that "neither he nor other similarly situated DAI holders was required to accept the Terms of Service (or even view them for that matter).  Nor do the Terms of Service cover the activities Plaintiff engaged in here in any event."  (ECF No. 36.)  As explained below, these contentions lack merit and the Maker Defendants' motion should be granted.

## ARGUMENT

## I.   THE COURT SHOULD GRANT THE MAKER DEFENDANTS' MOTION TO COMPEL ARBITRATION

The FAA governs the enforceability of arbitration provisions in "contracts evidencing a transaction involving commerce."  9 U.S.C. § 2.[7]  Under the FAA, an arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the

---

[7]   The agreement at issue evidences a transaction involving commerce.  *See*, *e.g.*, *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 268 (1995) (Section 2 of the FAA should be interpreted broadly).  The MakerDAO platform is available worldwide and governs transactions in digital assets.  (Becker Decl. ¶¶ 3, 6.)

1  revocation of any contract." *Id.* This requirement reflects a "liberal federal policy favoring

2  arbitration." *AT&T Mobility LLC*, 563 U.S. at 339 (2011) (citation omitted); *see also Republic of*

3  *Nicaragua v. Standard Fruit Co.*, 937 F.2d 469, 475 (9th Cir. 1991) ("The standard for

4  demonstrating arbitrability is not a high one; in fact, a district court has little discretion to deny an

5  arbitration motion, since the [FAA] is phrased in mandatory terms."); *Healy*, 2005 WL 387140, at

6  *2 ("The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, establishes a 'federal policy

7  favoring arbitration' and requires federal courts to 'rigorously enforce agreements to arbitrate.'"

8  (citation omitted)).

9         "The court's role under the FAA is 'limited to determining (1) whether a valid agreement to

10  arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue.'"

11  *Brown v. Dow Chem. Co.*, No. 18-cv-07098-MMC, 2019 WL 484211, at *1 (N.D. Cal. Feb. 7,

12  2019) (Chesney, J.) (citation omitted); *see also* 9 U.S.C. § 4; *Chiron Corp. v. Ortho Diagnostic*

13  *Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). However, when the parties delegate threshold

14  questions of arbitrability to the arbitrator, such as through the incorporation of arbitration rules that

15  do so, the court's role is further limited to determining only whether a valid contract to arbitrate

16  was formed and whether the delegation clause is valid. *See Brennan*, 796 F.3d at 1132.

17         As set forth below, Plaintiff affirmatively assented to the arbitration provision at issue,

18  which the Maker Defendants can enforce and which delegates questions of arbitrability to the

19  arbitrator. Under established law, this Court should compel arbitration and the arbitrator, rather

20  than this Court, should resolve any questions regarding the scope of the arbitration provision.

21         **A.**  **Plaintiff Affirmatively Assented to the Terms of Service**

22         First, Plaintiff entered into a valid agreement to arbitrate when he affirmatively assented to

23  the Terms of Service, which contain a provision requiring him to individually arbitrate his claims.

24  In California, the key to formation of an agreement to arbitrate is assent, *Cordas*, 228 F. Supp. 3d

25  at 988, and internet agreements are treated no differently than traditional agreements. *Holl v. U.S.*

26  *Dist. Court of Cal. (In re Holl)*, 925 F.3d 1076, 1084 (9th Cir. 2019).[8]

27  ──────────────

28  [8]   State contract law principles govern whether an agreement to arbitrate was formed between the parties. *See In re Holl*, 925 F.3d at 1083; *Kaselitz*, 2013 WL 622382, at *4. The Maker

*(cont'd)*

1    Online agreements are enforceable when they put a "website user on actual or inquiry

2    notice of [their] terms." *Peter v. DoorDash, Inc.*, No. 19-cv-06098-JST, 2020 WL 1967568, at *4

3    (N.D. Cal. Apr. 23, 2020).  It is well settled that so-called clickwrap agreements—where the user

4    affirmatively assents to the terms of service, usually by clicking a check box to "accept"—are valid

5    and enforceable in California because the user must acknowledge receipt and acceptance of the

6    terms of the agreement.  *See, e.g.*, *In re Holl*, 925 F.3d at 1085; *McLellan v. Fitbit, Inc.*, Case No.

7    3:16-cv-00036-JD, 2018 WL 1913832, at *2 (N.D. Cal. Jan. 24, 2018).  This includes agreements,

8    sometimes referred to as "modified clickwrap" agreements, in which the user is provided with a

9    hyperlink to the terms of service at the time of enrollment, but the terms are not provided on the

10   same page and the user is not required to view the terms of service before accepting.  *See, e.g.*,

11   *DoorDash, Inc.*, 2020 WL 1967568; *La Force*, 2017 WL 9938681, at *1; *Holl v. United Parcel

12   Serv., Inc.*, Case No. 16-cv-05856-HSG, 2017 WL 11520143, at *5 (N.D. Cal. Sept. 18, 2017);

13   *Nevarez v. Forty Niners Football Co.*, Case No. 16-CV-07013, 2017 WL 3492110, at *8 (N.D. Cal.

14   Aug. 15, 2017).

15   The decision in *La Force v. GoSmith, Inc.* is instructive.  2017 WL 9938681.  There, the

16   plaintiff challenged an agreement to arbitrate in GoSmith's Terms of Use, alleging that the parties

17   had not formed a valid agreement to arbitrate.  *Id.* at *3.  The website in that case provided a check

18   box to the left of text which read "I have read and agree to the terms & privacy policy."  *Id.* at *1.

19   In order to complete the registration process, the user was required to check the box.  *Id.*  The terms

20   and privacy policy were provided by hyperlink for the user to review, but the user was not required

21   to open the hyperlinks.  *See id.*  The court held that because the registration process "contained a

22   check box for indicating agreement" to the terms and the arbitration agreement included therein,

23   plaintiff had agreed to the terms.  *Id.* at *4.  On that basis, the *GoSmith* court granted the motion to

24   compel arbitration.  *Id.* at *4.

25   Similarly, in *Holl v. United Postal Service, Inc.*, the plaintiff challenged an agreement to

26   arbitrate in the United Parcel Service's ("UPS") terms of service, claiming the terms were

27   _____

28   Defendants do not concede that California law would apply to Plaintiff's claims and expressly
     reserve all rights with respect to any future arguments regarding the applicable law, based on
     conflicts of law principles or otherwise.

1  inconspicuous and thus he could not have assented to them.  2017 WL 11520143, at *3.  When the

2  plaintiff enrolled in the UPS My Choice Program, he was required to check a box next to text

3  which read "By selecting this checkbox and the Continue button, I agree to the UPS Technology

4  Agreement and the UPS My Choice® Service Terms."  *Id.* at *1.  The service terms were

5  hyperlinked next to the check box.  *Id.*  Those hyperlinked terms incorporated by reference a

6  separate set of terms, which included the arbitration provision at issue and which the user could

7  only access through several additional steps.  *Id.* at *2.  The Court held that plaintiff was on notice

8  of the additional terms, concluding that a valid agreement to arbitrate existed and compelling

9  arbitration.  *Id.* at *5.

10          Finally, in *Meyer v. Uber Technologies, Inc.*, 868 F.3d 66 (2d Cir. 2017) (applying

11  California law), the court evaluated the Uber interface at issue, highlighting that (i) the link to the

12  terms appeared near the button where users clicked to agree to register for an account; (ii) the

13  screen was not cluttered and had only a few fields; (iii) the terms of service link was written in a

14  different color than the background and the non-hyperlink text; (iv) the entire screen was visible at

15  once and the user did not need to scroll to find notice of the terms of service; and (v) the website

16  language was "a clear prompt directing users to read the Terms and Conditions and signaling that

17  their acceptance of the benefit of registration would be subject to contractual terms."  *Id.* at 78-79.

18  In addition, the court emphasized the "forward-looking" and "transactional" nature of the

19  agreement, stating that this context "reinforce[d]" its conclusion.  *Id.* at 80 ("The registration

20  process clearly contemplated some sort of continuing relationship between the putative user and

21  Uber, one that would require some terms and conditions, and the Payment Screen provided clear

22  notice that there were terms that governed that relationship.").  The *Meyer* court held that, when the

23  user clicked the button to register, the user had notice of the terms and unambiguously assented to

24  them.  *Id.* at 79-80.

25          The above cases apply with equal, if not greater, force to the Terms of Service at issue here.

26  Plaintiff affirmatively assented to the Terms of Service when he sought to use the MakerDAO

27  platform and opened his CDP.  Like the websites in *La Force* and *Holl*, Plaintiff was required to

28  click a check box to the left of language stating that "***I have read and accept the Terms of***

MOTION TO COMPEL ARBITRATION                                              Case No. 3:20-cv-02569-MMC

1    *Service*."  (Becker Decl. ¶ 7.)  Exactly as in *La Force* and *Holl*, the Terms of Service were

2    provided by a hyperlink directly to the right of the check box.  (*Id*.)  Plaintiff could not move

3    forward in creating a CDP account without checking that box and assenting to the Terms of

4    Service.  (*Id*.)  Further, the Terms of Service themselves contained the unambiguous arbitration

5    provision, providing that "any dispute arising under this Agreement shall be finally settled in

6    binding arbitration, on an individual basis."  (*Id*. at Ex. A.)  Moreover, like in *Meyer*, Plaintiff

7    sought out the MakerDAO platform and entered into a "forward-looking" and "transactional"

8    relationship, clearly contemplating a "continuing relationship" that would "require some terms and

9    conditions."  *Meyer*, 868 F.3d at 80.  Under Ninth Circuit precedent and settled California law, no

10   more is needed to establish Plaintiff's assent and agreement to be bound by the arbitration

11   provision at issue.  Accordingly, the Court should require Plaintiff to pursue his claims in

12   arbitration.

13          **B.**      **The Arbitrator Should Decide All Questions Regarding the Scope of**
              **Arbitrability**
14
              Second, the Terms of Service delegate to the arbitrator, as opposed to the Court, all
15
      questions concerning whether the dispute falls within the scope of the arbitration provision at issue.
16
      (Becker Decl. Ex. A.)  As such, if the Court finds that a valid arbitration agreement exists, the
17
      arbitrator must decide any remaining question regarding the scope of the arbitration agreement.
18
      *See Cordas*, 228 F. Supp. 3d at 992 ("Because the parties agreed to arbitrate . . . and agreed to
19
      delegate questions of arbitrability to an arbitrator, the remaining questions of whether the
20
      arbitration agreement is valid and whether it encompasses this dispute are delegated to an
21
      arbitrator.").
22
              As was recently recognized in *Caviani v. Mentor Graphics*:  "When a signed arbitration
23
      agreement includes a reference to specific arbitration rules—*e.g.*, AAA, JAMS, etc.—the Ninth
24
      Circuit has held that the parties agreed to delegate arbitrability itself to the arbitrator."  2019 WL
25
      4470820, at *4.  This holding is consistent with controlling Ninth Circuit authority, which
26
      recognizes that "[v]irtually every circuit to have considered the issue has determined that
27

28

MOTION TO COMPEL ARBITRATION                                          Case No. 3:20-cv-02569-MMC

1   incorporation of the [AAA] arbitration rules constitutes clear and unmistakable evidence that the

2   parties agreed to arbitrate arbitrability." *Brennan*, 796 F.3d at 1130 (citation omitted).

3   Here, the Terms of Service could not be clearer on this point:  they state that "any dispute

4   arising under [the Terms of Service] shall be finally settled in binding arbitration, on an individual

5   basis, in accordance with the [AAA's] rules for arbitration of consumer-related disputes."  (Becker

6   Decl. Ex. A at 9-10.)  Following this clause, the Terms of Service then provide a direct link to the

7   AAA rules.  (*See id.*)  The AAA rules state that "[t]he arbitrator shall have the power to rule on his

8   or her own jurisdiction, including any objections with respect to the existence, scope, or validity of

9   the arbitration agreement or to the arbitrability of any claim or counterclaim."  (*See* AAA

10  Consumer Arbitration Rules, R–14(a); RJN, Ex. A.)

11  Accordingly, the Terms of Service delegate to the arbitrator any questions regarding the

12  arbitrability of Plaintiff's claims, including the scope of the arbitration provision.  These questions,

13  if any, should thus be decided in the context of arbitration proceedings.

14  **C.**     **The Maker Defendants Can Enforce the Arbitration Provision**

15  Third, the Maker Defendants can enforce the arbitration provision under settled California

16  law.  The United States Supreme Court has held that a litigant who is not technically named as a

17  party to an arbitration agreement may nevertheless invoke arbitration under the FAA "if the

18  relevant state contract law allows [the litigant] to enforce the agreement."  *Arthur Andersen LLP v.*

19  *Carlisle*, 556 U.S. 624, 632 (2009); *see also GE Energy Power Conversion Fr. SAS, Corp. v.*

20  *Outokumpu Stainless USA, LLC*, 140 S.Ct. 1637, 1643-44 (2020) ("The 'traditional principles of

21  state law' that apply under Chapter 1 include doctrines that authorize the enforcement of a contract

22  by a nonsignatory.  For example, we have recognized that arbitration agreements may be enforced

23  by nonsignatories through "'. . . estoppel.'" (citations omitted)).  Thus, California "contract and

24  agency principles apply in determining the enforcement of an arbitration agreement by or against

25  nonsignatories."  *Airtourist Holdings LLC v. HNA Grp.*, No. C 17-04989 JSW, 2018 WL 3069444,

26  at *3 (N.D. Cal. Mar. 27, 2018); *see also Arthur Andersen LLP*, 556 U.S. at 630-31.  Significantly,

27  courts applying California law have repeatedly held that "arbitration is more likely to be attained"

28

MOTION TO COMPEL ARBITRATION                                    Case No. 3:20-cv-02569-MMC

1  where, as here, "the party *resisting* arbitration is a signatory." *Amisil Holdings*, 622 F. Supp. 2d at

2  831 (emphasis added).

3        Here, the Maker Defendants can invoke the arbitration provision under California law,

4  including the well-established principle of equitable estoppel.  "Generally, in the arbitration

5  context, equitable estoppel allows a nonsignatory to a written agreement containing an arbitration

6  clause to compel arbitration where a signatory to the written agreement must rely on the terms of

7  that agreement in asserting its claims against the nonsignatory."  *GE Energy*, 140 S.Ct. at 1644

8  (citation omitted).  Indeed, a party is equitably estopped from avoiding arbitration where (1) "the

9  signatory to a written agreement containing an arbitration clause must rely on the terms of the

10  written agreement in asserting its claims against the nonsignatory"; *Amisil Holdings*, 622 F.Supp.

11  2d at 840, or (2) the "plaintiff signatory alleges substantially interdependent and concerted

12  misconduct by the nonsignatory and another signatory and the allegations of interdependent

13  misconduct are founded in or intimately connected with the obligations of the underlying

14  agreement."  *Kaselitz*, 2013 WL 622382, at *7 (citation omitted).  This rule reflects the policy that

15  a plaintiff "cannot on the one hand, seek to hold the non-signatory liable pursuant to duties

16  imposed by the agreement, which contains an arbitration provision, but on the other hand, deny the

17  arbitration provision's applicability because the defendant is a non-signatory."  *Amisil Holdings*,

18  622 F. Supp. 2d at 840 (citation omitted).  Although either circumstance is sufficient to compel

19  arbitration, both are present here.

20              1.     <u>Plaintiff's claims rely upon and are interwoven with the Terms of Service</u>

21       Plaintiff necessarily must—and in fact does—rely on the terms of the Terms of Service in

22  asserting his claims against the Maker Defendants.  For example, Plaintiff alleges that the Maker

23  Defendants "actively misrepresent[ed] to investors in [their] platform . . . the risks associated with

24  it." (Compl. ¶ 1.)  To make this allegation, the Complaint directly quotes and relies on language

25  from the MakerDAO CDP Portal.  (Compl. ¶ 26.)  Notably, when Plaintiff opened his CDP

26  account, the CDP Portal specifically directed him and other potential users to the Terms of Service,

27  advising that they should "[s]ee the Terms of Service for risks involved."  (Becker Decl. ¶ 8.)  In

28  fact, this statement is on *the very same page* as the statement upon which Plaintiff relies in

1   Paragraph 26 of the Complaint.  (*Id.*)  The Terms of Service, in turn, contain statements regarding

2   the risks involved in using the MakerDAO platform and generating DAI, including, for example,

3   warning users that they may (i) experience complete loss of their funds or (ii) be negatively

4   impacted by the high volatility of certain cryptocurrencies, including ETH.  (*See id.* Ex. A at pp. 1,

5   5.)

6        The Complaint also relies on alleged misstatements and omissions that necessarily

7   implicate the Terms of Service.  For example, Plaintiff claims that the Maker Defendants "never

8   informed CDP Holders that the entirety of the CDPs could be forfeited."  (Compl. ¶ 45.)  However,

9   the Terms of Service themselves specifically state that "[t]here are numerous ways the Open

10  Source Software and Service could fail in an unexpected way, resulting in the ***total and absolute***

11  ***loss of all of [the user's] funds***."  (Becker Decl. Ex. A (emphasis added).)  Plaintiff cannot avoid

12  the document containing the very statements he alleges the Maker Defendants omitted, particularly

13  as part of a broader effort to evade his affirmative agreement to arbitrate.  *See Daniels v. Painter*,

14  No. CV 16-03782-RSWL-Ex, 2016 WL 11498957, at *7 (C.D. Cal. Sept. 16, 2016) ("Court[s] can

15  look to the complaint for duties the [d]efendant has [allegedly] breached to determine the

16  interconnectedness of the claims and the underlying contract."); *see also Wamar Int'l, LLC v.*

17  *Thales Avionics, Inc.*, Case No. SA CV 18-2217-DOC (KES), 2019 WL 1877615, at *11 (C.D.

18  Cal. Mar. 20, 2019) (nonsignatories could compel arbitration where plaintiff's claims for

19  conspiracy to commit fraud and intentional misrepresentation were related to the performance of

20  the agreements containing the arbitration clauses); *Larson v. Speetjens*, No. C05-3176 SBA, 2006

21  WL 2567873, at *7 (N.D. Cal. Sept. 5, 2006) ("No person can be permitted to adopt that part of an

22  entire transaction which is beneficial to him/her, and then reject its burdens."), *order clarified*, No.

23  C05-3176 SBA, 2006 WL 3365589 (N.D. Cal. Nov. 17, 2006).

24        Moreover, the Terms of Service repeatedly warn that if the user does not agree to the

25  written terms, they should not use the platform.  (*See* Becker Decl. Ex. A.)  In fact, Plaintiff could

26  not even create an account on the platform without first agreeing to the Terms of Service and

27  arbitration provision.  (*See id.* ¶ 7, Ex. B.)  As such, Plaintiff's claims are necessarily bound up

28  intertwined with the Terms of Service.

1    *Lucas v. Hertz Corp.*, 875 F. Supp. 2d (N.D. Cal. 2012) is instructive on this point.  There,

2    the plaintiff rented a car from a Hertz affiliate and was required to assent to a car rental agreement

3    containing an arbitration provision.  *Id.* at 995-96.  Plaintiff was in an accident while using the

4    rental car, allegedly due to its defective brakes, and brought suit against nonsignatory Hertz.  *Id.* at

5    996-97.  The court granted Hertz's motion to compel arbitration under the principle of equitable

6    estoppel, holding that:

7           the entire factual basis for [plaintiffs'] claims relies upon the existence
            of the car rental agreement [one of the plaintiffs] signed when he
8           rented the car from Costa Rica Rent a Car.  Simply put, he would not
            have been able to rent the car—and thus would not have had any
9           relationship with Hertz—without signing the rental agreement.  In
            such a situation, it would not be fair to allow [plaintiff] to rely upon
10          his signing the rental agreement to rent the car and to prevent Hertz
            from attempting to enforce the contract's arbitration clause.

11   *Id.* at 1003.

12          The decision in *Hertz* is on all fours here, where the entire factual basis for Plaintiff's

13   claims relies upon the existence of the Terms of Service which allowed him to open his CDP and

14   create his relationship with the Maker Defendants.  Because Plaintiff's claims are inextricably

15   intertwined with the Terms of Service to which Plaintiff affirmatively agreed, Plaintiff is bound to

16   arbitrate his claims against the Maker Defendants.  *See, e.g.*, *Airtourist Holdings*, 2018 WL

17   3069444, at *3 (defendants were entitled to compel arbitration based upon the doctrine of equitable

18   estoppel because the "[c]omplaint [was] based upon a series of operative facts that are inextricably

19   intertwined with the claims arising from and relating to the contracts that form the basis of the

20   parties' business venture"); *Franklin v. Cmty. Reg'l Med. Ctr.*, No. 1:19-cv-00709-SKO, 2019 WL

21   6701298, at *3-6 (E.D. Cal. Dec. 9, 2019) (nonsignatory defendant could compel arbitration where

22   plaintiff's claims for violations of wage and hour laws were necessarily governed by an

23   employment contract containing an arbitration agreement), *appeal filed*, No. 19-17570 (9th Cir.

24   Dec. 24, 2019); *see also Garcia v. Pexco, LLC*, 11 Cal. App. 5th 782, 787-88 (2017) (plaintiff's

25   claims against a nonsignatory defendant were intimately founded in and intertwined with his

26   employment relationship with the signatory defendant, which was governed by the employment

27   agreement containing an arbitration clause).

28

MOTION TO COMPEL ARBITRATION                                    Case No. 3:20-cv-02569-MMC

2.     The relationship between the Maker Defendants and Plaintiff's allegations provides another basis for enforcing the arbitration provision

Alternatively, the close relationship between SLS, the Maker Defendants and Plaintiff's allegations similarly weighs in favor of concluding that the Maker Defendants may invoke the arbitration provision.  *See, e.g.*, *Amisil Holdings*, 622 F. Supp. 2d at 830-31 ("[A] signatory can be compelled to arbitrate at the nonsignatory's insistence under 'an alternative estoppel theory'- *i.e.*, 'because of the close relationship between the entities involved, as well as the relationship of the alleged wrongs to the nonsignatory's obligations and duties in the contract ... and [the fact that] the claims were intimately founded in and intertwined with the underlying contract obligations.'" (citation omitted)).  Here, the Terms of Service expressly apply to all users of the MakerDAO system as well as MakerDAO and "ALL PERSONS, ENTITIES, AGENTS, AND VOLUNTEERS INVOLVED WITH THE CREATION OF THE DAI SYSTEM AND SOFTWARE."  (Becker Decl. Ex. A at 2-3.)  When Plaintiff opened his CDP in November 2018, SLS was doing business as MakerDAO.  (Becker Decl. ¶ 12.)  Shortly thereafter, SLS underwent a corporate reorganization during which SLS passed control of the MakerDAO website and CDP Portal subdomain to Defendant MEGH, which has continued to operate it to this day.  (*Id.*)  The Maker Defendants in turn adopted in 2019 Terms of Service that apply to any new accounts created and specifically identify MEGH as a signatory.  (*Id.* ¶ 13.)

Plaintiff himself recognizes the close relationship between MakerDAO and the Maker Defendants in his Complaint.  (*See, e.g.*, Compl. ¶ 8.)  Indeed, Plaintiff alleges no particular allegations against either of the Maker Defendants but rather lumps together different statements made by various entities (including statements that precede the Maker Defendants' formation) and attributes them all to the Maker Defendants.  (*Id.*)  This constitutes an independent basis for allowing the Maker Defendants to hold Plaintiff to his agreement to arbitrate his claims.  *See Kaselitz*, 2013 WL 622382, at *7 (nonsignatory defendant was entitled to compel arbitration where the complaint alleged interdependent conduct between the signatory and nonsignatory, and plaintiff sought damages from the nonsignatory based primarily on conduct by the signatory); *Metalclad Corp. v. Ventana Envtl. Organizational P'ship*, 109 Cal. App. 4th 1705, 1717 (2003) ("The nexus

1  here between [plaintiff's] claims against [defendant] and the underlying contract with [the

2  signatory], as well as the integral relationship between the [signatory] and [defendant], persuades

3  us equitable estoppel should apply.").

4  **II.     THE CASE SHOULD BE DISMISSED PENDING ARBITRATION**

5            Finally, this Court should dismiss Plaintiff's claims in favor of arbitration.  The Ninth

6  Circuit has held that when arbitration is mandatory, the Court has discretion to dismiss the case.

7  *See Sparling v. Hoffman Constr. Co.*, 864 F.2d 635, 638 (9th Cir. 1988); *see also Nevarez*, 2017

8  WL 3492110, at *15.  When all of the claims are subject to arbitration, it is particularly appropriate

9  for the Court to dismiss the action in its entirety.  *See Hopkins*, 2011 WL 1327359, at *8.  Here, all

10 of Plaintiff's claims are subject to mandatory arbitration and the case should be dismissed in favor

11 of arbitration.[9]

12                               **CONCLUSION**

13           For the reasons stated, the Maker Defendants respectfully request that the Court compel

14 arbitration and dismiss all proceedings in the action.

15 DATED:      July 15, 2020

16                                    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

17

18                          By:  _____
                                          */s/ Peter B. Morrison*
                                          PETER B. MORRISON
19                                        *Attorneys for Defendants*
                                 MAKER ECOSYSTEM GROWTH HOLDINGS, INC.
20                               AND MAKER ECOSYSTEM GROWTH FOUNDATION

21

22

23

24

25

26

27 _____

28 [9]   Alternatively, the Maker Defendants request a stay of this action pending arbitration.  Should
   the motion to compel arbitration be denied, the Maker Defendants continue to reserve all rights to
   seek to dismiss the Complaint under Rule 12 of the Federal Rules of Civil Procedure.

18