1    Adam S. Heder, CSB #270946
     adamh@hbclawyers.com
2    Harris Berne Christensen LLP
     15350 SW Sequoia Parkway
3    Suite 250
     Portland, OR 97224
4    Phone: 503-968-1475
     Fax: 503-968-2003
5
     Of Attorneys for Plaintiff PETER JOHNSON,
6    individually and on behalf of all others similarly situated

7

8                    IN THE UNITED STATES DISTRICT COURT

9              FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                        SAN FRANCISCO DIVISION

11

12   **PETER JOHNSON,** individually and on        Case No. 3:20-cv-02569-MMC
     behalf of all others similarly situated,
                                                    **OPPOSITION BRIEF TO THE MAKER**
13                          Plaintiff,              **DEFENDANTS' MOTION TO COMPEL**
                                                    **ARBITRATION**
14          v.
                                                    **ORAL ARGUMENT REQUESTED**
15   **MAKER ECOSYSTEM GROWTH**
     **HOLDINGS, INC.,** a foreign corporation;     **Date:**        **October 2, 2020**
16   **MAKER ECOSYSTEM GROWTH**                      **Time:**        **9:00 a.m.**
     **FOUNDATION,** a foreign corporation; and     **Courtroom:**   **7**
17   **DAI FOUNDATION**, a foreign corporation,     **Judge:**       **Hon. Maxine M. Chesney**

18                          Defendants.

19

20

21

22

23

24

                                              1
     Opposition to Motion to Compel Arbitration

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

OPPOSITION BRIEF TO MOTION TO COMPEL ARBITRATION……………………..1

SUMMARY……………………………………………………………………………2

FACTUAL BACKGROUND……………………………………………………………….5

I.     In 2017, the Maker Defendants introduce their first product, a
Crypto currency called Sai……………………………………………..5

II.    After approximately two years of using Sai as its exclusive crypto
currency, the Maker Defendants unveil in 2019 a new product, a new
currency called Dai, that they promise is more sophisticated and
versatile…………………………………………………………………..6

III.   Motivated to push everyone onto their new system, the Maker
Defendants begin an aggressive campaign to push Sai holders to
become Dai holders…………………………………………..…….7

IV.   So naturally, Mr. Johnson abandons the old and adopts the new……..…..8

V.    The Maker Defendants issue a new set of Terms of Service to

Address the Dai System………………………………………….…..9

VI.   Notwithstanding an apparently new set of Terms of Service for the
Dai System, signing up with the new system does NOT require
Viewing, reading, agreeing with, or in any way acknowledging
Any "Terms of Service"…………………………………………..…….9

VII.  The Maker Defendants concede that their new product does not

Require users to acknowledge or view any set terms of disclosures……...9

VIII. The Maker Defendants shut down the Sai platform in 2020……………10

IX.  Importantly, the Sai System was still operating at the time of Black
Thursday but did not suffer a crash, like the Dai system did……………11

X.    The Dai System – which the Maker Defendants repeatedly
marketed as a new product on a fundamentally different
platform – does NOT require its users to ever view or acknowledge
the Terms of Service………………………………………………..…….12

i

Opposition to Motion to Compel Arbitration

ARGUMENT…………………………………………………………..……………13

    I.      Clickwrap agreements are generally enforceable; browsewrap
            Agreements are generally not…………………………………………..13

    II.     When he signed up for the Dai System in 2019, Mr. Johnson
            never saw, reviewed, or clicked through any Terms of Service………..14

    III.    The Maker Defendants nevertheless ask the Court to blissfully
            Ignore all their marketing, all their top-down mandates, and all
            the realities of this switch to the new Dai System and conflate
            signing up for the prior with signing up for the latter…...……………..16

    IV.    The Maker Defendants cannot prove – nor have they even tried
            To prove – there was an enforceable browsewrap agreement………....18

    V.     Consequently, the question of arbitrability is to be decided by
            This Court, not an arbitrator……………………………………………19

CONCLUSION………………………………………………………………………20

Opposition to Motion to Compel Arbitration

## <u>TABLE OF AUTHORITIES</u>

<u>**Page**</u>

**Cases**

*Be In, Inc. v. Google Inc.*, No. 12-CV-03373-LHK, 2013 U.S. Dist. LEXIS 147047, at *23-24
(N.D. Cal. Oct. 9, 2013) ................................................................................................ 3

*Burnham v. City of Ronert Park*, No. C 92-1439 SC, 1992 U.S. Dist. Lexis 8540, at *2 n.2 (N.D.
Ca. May 18, 1992) ...................................................................................................... 19

*Cordas v. Uber Techs., Inc.*, 228 F. Supp. 3d 985, 990 (N.D. Cal. 2017) .................................... 2

*Long v. Provide Commerce, Inc.*, 245 Cal. App. 4th 855, 862 (2016) ........................................ 13

*Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017) ........................................................ 2

*Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) ........................................ 13

*Wilson v. Huuuge, Inc.*, the Ninth Circuit ................................................................................ 13

Opposition to Motion to Compel Arbitration

1

## SUMMARY

2
3

*"Unless we make it explicit in the interfaces like, 'oh you have to go to these places and learn about it and these are all the risks,' we just didn't do that."*

4
5
6

*"I don't even know how you'd do that [i.e., disclose the risks of operating on the Dai System to users] in the interfaces, there's so many interfaces . . . how do you put a "please read this" and then tell everybody to include that in an interface?  It's a nice concept but in a decentralized system . . . ."* [1] [2]

7

Following the events of March 12, 2020, or Black Thursday, members, leaders, and

8

officers of the cryptocurrency platform at issue in this case, the "Dai System," met online to

9

discuss what went wrong.  That meeting included members and officers of the moving parties in

10

this case, Maker Ecosystem Growth Holdings, Inc. and Maker Ecosystem Growth Foundation,

11

the Maker Defendants, and was recorded and posted to YouTube.  We have posted a link below

12

for the Court's reference.[3]  The focus of the meeting at one point turned to whether the Maker

13

Defendants had provided sufficient notice of the terms and risks of doing business on the Dai

14

System platform.   And as the Court can see, those meeting participants acknowledged that in

15

this respect, their product was deficient.  While inserting a conspicuous notice of the terms of

16

using the system was a "nice concept," one user remarked, in a "decentralized system," like the

17

Dai System, ensuring such notice was not practical.

18

In the world of internet-based contracts, there are two general categories:  clickwrap

19

agreements and browsewrap agreements.  The former is one that requires the user to click an "I

20

agree" box after being presented the terms and conditions of use.  *Meyer v. Uber Techs., Inc.*, 868

21

F.3d 66, 75 (2d Cir. 2017) (applying California law); *Cordas v. Uber Techs., Inc.*, 228 F. Supp.

22

3d 985, 990 (N.D. Cal. 2017).  Such agreements are generally enforceable.  The latter, in

---

[1] *See* Maker Foundation Governance and Risk Meeting: Ep. 82 (the "*Risk Meeting*"), at approximately 54:40, published on March 24, 2020 (*available at:* https://youtu.be/erh25lnaIo0) (last visited August 16, 2020).

[2] Each of the websites, documents, videos, and other materials included herewith by way of hyperlink have been reviewed and verified by Plaintiff, Peter Johnson, in his Declaration in Support of the Plaintiff's Opposition to the Maker Defendants' Motion to Compel Arbitration (the "Johnson Decl."), ¶ 4.

[3] *Id.*

contrast, is one where the user need not click an "I agree" box but can, instead, "continue to use the website or its services without visiting the page hosting the browsewrap agreement or even knowing that such a webpage exists." *Be In, Inc. v. Google Inc.*, No. 12-CV-03373-LHK, 2013 U.S. Dist. LEXIS 147047, at *23-24 (N.D. Cal. Oct. 9, 2013).  Such agreements are not presumptively enforceable.

Mr. Johnson signed up online to be a user on the Dai System in November 2019.  His complaint alleges that approximately five months later, on March 12, 2020, that *Dai System* did not operate as represented, resulting in millions of dollars in loss to its users.  The Maker Defendants have responded by asking the Court to dismiss that complaint, arguing that Mr. Johnson entered a clickwrap agreement and agreed to arbitrate all his claims.

And so, the parties come to the Court to address a singular, pivotal question:

*When signing up online for the Dai System in 2019, did Mr. Johnson agree to an enforceable clickwrap agreement?*

If "yes," then the Terms of Service likely control, and arbitration will probably be compelled.  If "no," there is no enforceable agreement, and this Court retains jurisdiction of Mr. Johnson's complaint.  Mr. Johnson signed up for the Dai System in November 2019.  And when he did, the Maker Defendants did not present, provide, or otherwise require Mr. Johnson to review, acknowledge, or read any Terms of Service.  There was no clickwrap agreement, no browsewrap agreement, and certainly no assent to ever arbitrate Mr. Johnson's claims.  So, the answer to the question asked above is a clear "no."

But the Maker Defendants ignore this central question.  In fact, nowhere does their Motion address whether Mr. Johnson ever entered a clickwrap agreement *when he signed up for the Dai System in 2019.*  Instead, the Maker Defendants ask the Court to enforce a set of Terms of Service that Mr. Johnson reviewed and agreed to *in 2018 when he signed up for a different platform that the Defendants no longer use, encouraged their users to abandon, and earlier this year affirmatively shutdown.*  That system, referred to in this Brief as the Sai System (and

Opposition to Motion to Compel Arbitration

described more below), was a materially different product and platform from the Dai System. And how do we know that? Because the Maker Defendants themselves tell us so. As detailed below, the Maker Defendants repeatedly stressed the changes and improvements to the new system and the irrelevance of the Sai System in favor of switching all users to the new Dai System, which it rolled out in 2019. The Maker Defendants actually threatened penalties to persons who did not switch over to the Dai System and ultimately shut down the Sai System earlier this year. And when users signed up for the Dai System, they had to move through a new "sign up;" they could not simply rely on having previously signed up with the Sai System. The Maker Defendants do not, and cannot, identify any agreement, clickwrap, browsewrap, or otherwise, that Mr. Johnson ever saw or agreed to or was even presented with when he signed up for the Dai System in 2019.

Unable to point to any clickwrap agreement entered into for the Dai System, the Maker Defendants equate Mr. Johnson signing up for the 2018 Sai System with signing up for the 2019 Dai System, and, on that basis, ask the Court to enforce the 2018 agreement for Mr. Johnson's use of the 2019 Dai System. That makes no sense, and the Maker Defendant's own repeated assertions and actions belie that argument now: For nearly two years, the Maker Defendants repeatedly marketed the Dai System over the Sai System; they actively encouraged users of the Sai System to move to the Dai System and abandon the former; they in fact did abandon the former and shut it down earlier this year; they actually issued a new set of Terms of Service for the Dai System (which they conveniently never try to invoke in their brief); they repeatedly stressed the differences in the two systems and the improvements in the new; and, most importantly, users of the Dai System *were required to sign up anew for it without reference to the Sai System (or any Terms of Service).* Indeed, Mr. Johnson does not dispute that when he signed up for the Sai System in 2018, he acknowledged reviewing the Terms of Service. But again, that 2018 agreement is not relevant here because the parties are litigating Mr. Johnson's experience on the *new Dai System*, not the *old Sai System*, and *the new Dai System* did not

Opposition to Motion to Compel Arbitration

require Mr. Johnson to ever review or read any Terms of Service.

That the two systems represent fundamentally different products that require different agreements and different user terms is confirmed not only by the Defendants' statements but also by the events of March 12, 2020. As detailed below, the Sai System was still in use in March 2020 (it was shut down shortly thereafter) and, in contrast with the Dai System, did NOT suffer the crash and zero-bid auctions that the Dai System did. In other words, had Mr. Johnson not abandoned the Sai System, like the Maker Defendants repeatedly urged him to, he would not have suffered the zero-bid auction and there would be no lawsuit.

But perhaps most importantly, as the excerpts from the Governance and Risk Meeting above highlight, the Maker Defendants themselves acknowledge that the Dai System did not direct its users to any set of disclosures or contractual terms; nor did it otherwise require assent to any such terms. As one individual termed it, requiring Dai System users to agree to a clickwrap agreement was a "nice concept," but ultimately infeasible in a "decentralized system."

Mr. Johnson never saw or reviewed any agreement, clickwrap, browsewrap, or otherwise when he signed up for the Dai System. And the Maker Defendants' invocation of a 2018 agreement for an outdated, now abandoned product to avoid a lawsuit in connection with their mishandling and misrepresentations of the 2019 product is nothing more than opportunism. And Mr. Johnson respectfully requests that the Court deny the Motion to Compel Arbitration.

## FACTUAL BACKGROUND

### I.   In 2017, the Maker Defendants introduce their first product, a crypto currency called Sai.

The Maker Defendants began developing the underlying code, protocol, and governance structure of their digital, "crypto" currency—Sai—in 2014.[4]

In December 2017, Defendant published the very first Maker White Paper, introducing their crypto system. The currency was initially known as Sai.[5]

---

[4] *See* The Maker Foundation White Paper (the "*Second White Paper*"), *available at*: https://makerdao.com/en/whitepaper/#introduction (last visited August 16, 2020).

[5] *Id.*; a copy of the original December 2017 White Paper (the "*First White Paper*") is available for browsing at

Opposition to Motion to Compel Arbitration

The concept of Sai was simple: Anybody could sign up on this new platform by forming what is called a collateralized debt position, or CDP.  Through that CDP, any user could generate the currency, Sai, by leveraging as collateral a digital asset called Ethereum (which is a different crypto currency that exists independent of Sai or CDPs).  Because Ethereum was the only collateral asset one could use to generate Sai, the currency was referred to as Single-Collateral Dai, or Sai.[6]

Excited by the Maker Defendants' promises of a decentralized, open, stabile crypto currency, Plaintiff Mr. Peter Johnson opened his own CDP—number 4615—through the Maker Platform on or around November 29, 2018.[7]  In connection with opening that CDP for use in the Sai System, Mr. Johnson was required to review and acknowledge reviewing the "Terms of Service" that contained, among other things, an arbitration clause.

## II.     After approximately two years of using Sai as its exclusive crypto currency, the Maker Defendants unveil in 2019 a new product, a new currency called Dai, that they promise is more sophisticated and versatile.

The "Sai System" was in use for roughly two years.  But starting sometime in 2019, the Maker Defendants began announcing the development of a new system, a new currency meant to replace the Sai.  This new currency, the Maker Defendants explained, could be collateralized by more than Ethereum.  Among other things, the Maker Defendants promised that the Dai System would "introduce exciting new features to the Maker Protocol," including use of the long-promised, multi-collateral Dai, "the future of digital money."[8]  Accordingly, "anyone looking to take advantage of all of [the Dai System's] many developments should upgrade to Dai as soon as possible."[9]  And thus, Single-Collateral Dai became Multi-Collateral Dai.  In short, Sai became

---

https://makerdao.com/en/whitepaper/sai/#overview-of-the-dai-stablecoin-system (last visited August 16, 2020).

[6] First White Paper, 3.

[7] *See* Johnson Decl., ¶¶ 5–7.

[8] *See* the MakerDAO Blog, *What to Expect With the Launch of Multi-Collateral Dai*, published on November 8, 2019 (*available at*: https://blog.makerdao.com/what-to-expect-with-the-launch-of-multi-collateral-dai/) (last visited August 16, 2020).

[9] *Id.*

Opposition to Motion to Compel Arbitration

Dai, and the Sai System became the Dai System.[10]

### III.   Motivated to push everyone onto their new system, the Maker Defendants begin an aggressive campaign to push Sai holders to become Dai holders.

Realizing that the upgrade from the Sai System to the Dai System required that "the entire core of" the Maker Protocol be "rewritten," the Maker Defendants cautioned their users that "to take advantage of these improvements, users and partners working with [Sai] . . . *must upgrade to MCD [Dai] upon its release*."[11]  This marked the start of an aggressive campaign to migrate users to the new Dai System, while simultaneously taking steps to shut down the old Sai System.

The Maker Defendants further warned users of the necessity of closing their CDPs (under the Sai System) and converting them to Vaults (the terminology for a CDP under the new Dai System), using bold notices and warnings such as the following from its blog:

> **IMPORTANT: If you hold any Dai today, either in a wallet, CDP, or on an exchange, you must upgrade when MCD is released (unless the exchange offers to handle this for you), otherwise you will be subject to Emergency Shutdown, which is explained below.[12]**

If users failed to upgrade their CDPs to Vaults before the expiration of "a grace period," the Maker Defendants warned, "the current version of Maker Protocol (SCD) will be shut down and any existing Dai and SCD CDPs will be settled."[13]

The Maker Defendants instructed their users that they could either convert or "migrate" their CDPs to Vaults "through the Migration App at migrate.makerdao.com at launch" or that

---

[10] *See* The Maker Foundation Blog, *Update: The Road to Multi-Collateral Dai*, published March 27, 2019 (*available at*: https://blog.makerdao.com/update-road-to-multi-collateral-dai/) (last visited August 16, 2020); The Maker Foundation Blog, *Looking Ahead: How to Upgrade to Multi-Collateral Dai from Single-Collateral Dai*, published September 23, 2019 (*available at*: https://blog.makerdao.com/looking-ahead-how-to-upgrade-to-multi-collateral-dai/) (last visited August 16, 2020) (hereinafter referred to as *"Looking Ahead"*); The Maker Foundation Blog, *Say Goodbye to CDPs and Hello to Maker Vaults*, published October 31, 2019 (*available at*: https://blog.makerdao.com/say-goodbye-to-cdps-and-hello-to-maker-vaults/) (last visited August 16, 2020); *see also MCD Upgrade Guide*, first published by The Maker Foundation on or around May 4, 2019 (*available at*: https://github.com/makerdao/developerguides/blob/master/mcd/upgrading-to-multi-collateral-dai/upgrading-to-multi-collateral-dai.md) (last visited August 16, 2020).

[11] *See* Looking Ahead, *supra* note 10, (emphasis added).

[12] *Id.* (emphasis in original).

[13] *Id.*

---

Opposition to Motion to Compel Arbitration

they could "choose to manually close [their] CDP" and use their "redeemed collateral to open a new MCD CDP" or Vault.[14]

Conceding, however, that large CDPs—like Mr. Johnson's—could be difficult to migrate through the Maker Protocol or its own migration application, the Foundation noted that, "[i]f you have a large SCD CDP, the migration contract might not have enough Sai liquidity to carry out the migration.  In that case, feel free to contact integrate@makerdao.com for assistance."[15]

Officers of the Maker Defendants also threatened users to migrate their CDPs to Vaults or face stiff penalties.  In a reddit post on or around November 19, 2019, Maker Ecosystem Growth Foundation CEO Rune Christensen—using the moniker Rune4444—stressed the importance of immediate migration to Dai:

> I think the best strategy is to migrate soon after December 2, once the big exchanges all upgrade their Dai. Then there should be plenty of Sai available to enable you to upgrade, and the system will have been battle tested enough that the exchanges have switched over.

> Beyond that, there is no cost to waiting further though it might take more effort to get access to Sai bandwidth for your migration (so it might take longer to do in some cases) and if you do hold your CDP all the way until the Shutdown (no date has been set for this yet).

> ***There will be a shutdown penalty that is likely higher than your stability fee*** (it will be set based on the top quantile of outstanding relative stability fees to properly incentivize the majority of CDP holders to switch in order to maintain the game theory that keeps Sai stable).

> There is also a small probability that the Sai price surges in the short run, forcing a more sudden, reactive shutdown of Sai to protect CDP holders, but I wouldn't expect that to happen within the first few months.[16]

**IV.    So naturally, Mr. Johnson abandons the old and adopts the new.**

In light of the repeated dire warnings and nearly a year after the creation of his Sai CDP,

---

[14] *See Upgrading to Multi-Collateral Dai* (*available at*: https://github.com/makerdao/developerguides/blob/master/mcd/upgrading-to-multi-collateral-dai/upgrading-to-multi-collateral-dai.md#as-a-scd-cdp-owner) (last visited August 16, 2020).

[15] *Id.*

[16] *See* Reddit Post, *How critical is it to migrate my CDP to MCD?*, Published on November 19, 2019  (*available at*: https://www.reddit.com/r/MakerDAO/comments/dyooe6/how_critical_is_it_to_migrate_my_cdp_to_mcd/) (last visited August 16, 2020).

Opposition to Motion to Compel Arbitration

Mr. Johnson opted to close out his Sai-based CDP and sign up for a new Dai-based Vault on November 19, 2019, creating a new Vault number 849.[17]

### V.   The Maker Defendants issue a new set of Terms of Service to address the Dai System.

Apparently in connection with the roll out of the Dai System, the Maker Defendants, in the words of their COO, "implemented the 2019 Terms of Service."[18]

### VI.   Notwithstanding an apparently new set of Terms of Service for the Dai System, signing up with the new system does NOT require viewing, reading, agreeing with, or in any way acknowledging any "Terms of Service."

To facilitate creating his new Dai-based Vault, Mr. Johnson utilized the services of a third-party user interface, instadapp.io, which handled the CDP closure and Vault conversion process automatically.[19]

Importantly, *instadapp.io did not require Mr. Johnson to click, view, or otherwise agree to the Terms or any other kind of arbitration clause or "Terms of Service."*[20]

For the Court's convenience, Mr. Johnson has provided a hyperlink to a video-capture of this process of Vault creation through instadapp.io that matches his own process, demonstrating an utter lack of any kind of acknowledgment or click-through to the Terms or any other kind of user agreement.[21]

To be clear, therefore:  Mr. Johnson at no point was required to view, click through, acknowledge agreement with, or otherwise click "I agree" with any set of "Terms of Service" when he signed up for his Vault in November 2019.

### VII.   The Maker Defendants concede that their new product does not require users to acknowledge or view any set terms or disclosures.

In utilizing a third-party website to facilitate his migration to the new platform that

---

[17] *See* Johnson Decl., ¶¶ 8–9.

[18] ECF No. 41-1, at pp. 4-5, Declaration of Steven Becker, ¶ 13.

[19] Johnson Decl., ¶ 10.

[20] *Id.*, ¶ 11.

[21] *Id.*, ¶ 12, referring the Court to a hyperlinked video available at the following address: https://youtu.be/9uIE7oI9AS0.

Opposition to Motion to Compel Arbitration

contained no reference to the "Terms of Service," Mr. Johnson's experience is far from unique. The Maker Defendants themselves acknowledged that third party platforms did not require and still do not require their users to view any Terms of Service when converting or creating Vaults.[22]

In the Maker Risk Meeting, members and officers of the Maker Defendants – including members of the purported Maker Decentralized Autonomous Organization which, at least in theory, governs the Maker Protocol – noted that third-party interfaces like that used by Mr. Johnson did not include or require acknowledgement or receipt of any the Maker Defendants' materials, stating specifically that such a requirement would be "a nice concept," but ultimately not feasible "in a decentralized system."[23]

The participants in the Risk Meeting also noted that this lack of oversight over third-party interfaces could result—and did result—in a distinct lack of information from the Maker Defendants, which absence could ultimately result in regulatory scrutiny for failures to warn Vault holders of the risks they faced.[24]

## VIII.   The Maker Defendants shut down the Sai platform in 2020.

Following shortly on the heels of the March 2020 zero-bid liquidation event at the root of this case, the Maker Defendants announced the impending shutdown of the Sai System on April 17, 2020.[25]

In its announcement, the Foundation noted that "[m]any in the community have already migrated their Sai holdings to Dai to take advantage of MCD's great features, and in anticipation of the Shutdown."[26]

---

[22] *See* Maker Foundation Governance and Risk Meeting: Ep. 82 (the "*Risk Meeting*"), at approximately 54:40, published on March 24, 2020 (*available at*: https://youtu.be/erh25lnaIo0) (last visited August 16, 2020).

[23] *Id.*

[24] *Id.*

[25] *See* The Maker Foundation Blog, *A Guide to Single-Collateral Dai (Sai) Shutdown*, published on April 17, 2020 (*available at*: https://blog.makerdao.com/a-guide-to-single-collateral-dai-sai-shutdown/) (last visited August 16, 2020).

[26] *Id.*

Opposition to Motion to Compel Arbitration

The Foundation observed that "[u]sers who hold Sai after [the Emergency Shutdown] is triggered should be able to redeem collateral through an Emergency Shutdown Redemption user interface that the Maker Foundation will create."[27]

Further, the Foundation reminded those users who had yet to migrate or convert their Sai-based CDP to a Dai-based Vault that they could "manually close their CDPs by paying back their debt, freeing up their ETH, and using it as collateral to open a new MCD Vault."[28]

On approximately May 12, 2020, the Maker Defendants shutdown the Sai System completely.[29]

### IX. Importantly, the Sai System was still operating at the time of Black Thursday but did NOT suffer a crash, like the Dai System did.

As discussed above, between the launch of the Dai System in November 2019 and the Sai System shut down of May 12, 2020, the Maker Defendants operated two fundamentally different platforms with two distinct products—CDPs and Vaults—for six months.

On March 12, 2020—Black Thursday—the price of Ethereum dropped dramatically, triggering mass auctions of Vault holders' Ethereum.[30]  These auctions, as Mr. Johnson has alleged in the First Amended Complaint, did not function properly, and certain "bots" were able to bid for Mr. Johnson's outstanding Ethereum for $0.  On Black Thursday, Mr. Johnson had 1,713.7 Ethereum locked as collateral for his Vault.  Had these "zero-bid auctions" not occurred, Mr. Johnson would have no less than 348 Ethereum remaining (worth at least $42,000.00 at the time of liquidation and roughly $150,000 at the time of this filing).  Tragically, this was true for countless Vault holders that day.  And the Maker Defendants' failure to prevent those zero-bid auctions is at the heart of Mr. Johnson's complaint.[31]

---

[27] *Id.*

[28] *Id.*

[29] *Id.*; *see also* Johnson Decl., ¶ 15.

[30] *See* Johnson Decl., ¶ 13; *see also* the MakerDAO Blog, *The Market Collapse of March 12-13, 2020: How It Impacted MakerDAO*, published on April 1, 2020 (*available at*: https://blog.makerdao.com/the-market-collapse-of-march-12-2020-how-it-impacted-makerdao/).

[31] *See* Johnson Decl., ¶¶ 14–16.

Opposition to Motion to Compel Arbitration

But remarkably, the Sai System did NOT suffer a similar critical failure as the Dai System.  As described in detail in the First White Paper,[32] liquidated CDPs on the Sai System were "immediately acquired by the [Maker] system," after which the "CDP owner receive[d] the value of the leftover of the collateral minus the debt," and any interest and liquidation penalties.[33]  In contrast, Vaults on the Dai System relied exclusively on an "automatic auction" function, which in turn required "external actors to maintain operations," including those bots which executed the zero-bid auctions.[34] As Rune Christensen aptly put it in September 2017, "[t]he difference between sai and dai here is that in dai . . . liquidations happen with auctions, and in sai they happen by selling at a rate relative[ ] to the value given by the price feed."[35]

In other words, had Mr. Johnson NOT closed his Sai-based CDP and migrated to a Dai System Vault – as the Maker Defendants repeatedly pressured him to do – Mr. Johnson would NOT have lost the entirety of his collateral to an exposed and deficient auction process; rather, he would have been left with at least 348 Ethereum, i.e., his collateral minus his interest and liquidation penalty.  Put simply, he would have been better off, and he would not be in this lawsuit today.

X.  **The Dai System – which the Maker Defendants repeatedly marketed as a new product on a fundamentally different platform – does NOT require its users to ever view or acknowledge the Terms of Service.**

Since the Sai System shutdown, the only operating system on the Maker Protocol is the Dai System.[36]  Given the proliferation of popular third-party user interfaces, including instadapp.io and defisaver, more and more users—including the putative class in this case—have opened and undoubtedly will open Dai-based Vaults without ever being presented, confronted

---

[32] *See* supra note 4; https://makerdao.com/en/whitepaper/sai/#automatic-liquidations-of-risky-cdps.

[33] *Id.*

[34] *Id.*

[35] *See* Reddit Post, *Oracles for Sai vs. Dai*, published on or around September 28, 2017 (*available at*: https://www.reddit.com/r/MakerDAO/comments/7345ju/oracles_for_sai_vs_for_dai/?utm_source=share&utm_medium=ios_app&utm_name=iossmf) (last visited August 16, 2020).

[36] *See* Johnson Decl., ¶ 16.

Opposition to Motion to Compel Arbitration

with, or required to acknowledge the Terms.[37]

## ARGUMENT

I.    **Clickwrap agreements are generally enforceable; browsewrap agreements are generally not.**

Parties to a contract must both agree to its terms before it can be enforced.  This legal doctrine is referred to as the "meeting of the minds" or "mutual assent."  In California, "[m]utual assent is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings." *Long v. Provide Commerce, Inc.*, 245 Cal. App. 4th 855, 862 (2016).

This requirement does not change simply because the contract was entered into on the internet.  "While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (citation omitted).  And whether parties mutually assented to the terms of an internet-based contract hinges on what type of web-based agreement was at issue. Generally speaking, there are two types of internet contracts:  clickwrap agreements and browsewrap agreements.

A clickwrap (or "click-through" or "scroll-wrap") agreement is one that requires the user to click an "I agree" box after being presented the terms and conditions of use. *Meyer*, 868 F.3d at 75 (applying California law). Because such agreements necessarily require a user to acknowledge agreement with whatever terms are at issue, such "clickwrap" agreements are generally enforceable.  *See, e.g.*, *Cordas*, 228 F. Supp. 3d at 990.

In contrast, a browsewrap agreement is one where the user can "continue to use the website or its services without visiting the page hosting the browsewrap agreement or even knowing that such a webpage exists." *Google*, at 2013 U.S. Dist. LEXIS 147047, at *23-24.  In *Wilson v. Huuuge, Inc.*, the Ninth Circuit ruled that an agreement is "unambiguously a

---

[37] *Id.*, ¶ 17.

browsewrap agreement" where the user (i) is not required to assent to the terms before using the service or website, or (ii) is not notified that the website or app had terms and conditions, "let alone put them in a place the user does not have to seek them out." 944 F.3d 1212, 1220 (9th Cir. 2019).  Unsurprisingly, browsewrap agreements are not *per se* enforceable because they are a "power[ful] means of binding users with very little affirmative assent." *Google*, at 2013 U.S. Dist. LEXIS 147047, at *33 (citation omitted)). "Unlike a clickwrap agreement, a browsewrap agreement does not require the user to manifest assent to the terms and conditions expressly," thus making these agreements contrary to the principles of contract law. *Nguyen*, 763 F.3d at 1176. Therefore, because affirmative consent is not required for a browsewrap agreement, the determination of validity depends on whether the user had (i) actual or (ii) constructive knowledge. *Id.* at 1176.

The Maker Defendants assert that the "Terms of Service" were a clickwrap agreement and thus presumptively enforceable.  They fail to address whether the "Terms of Service" would be enforceable as a browsewrap agreement (they are not), because the Maker Defendants no doubt realize that in the absence of a clickwrap agreement there is no way they could ever demonstrate – and they have the burden of proof on a motion to compel arbitration[38] – that Mr. Johnson ever viewed, read, was presented with, or was otherwise put on constructive or actual notice of the Terms of Service.  As Mr. Johnson's attached declaration and the demonstrative attached therein make clear, he never was and never did.

But in any event, the Maker Defendants' argument that Mr. Johnson entered a clickwrap agreement and must, therefore be bound by its terms, fails for one simple reason:  It is false.

## II.   When he signed up for the Dai System in 2019, Mr. Johnson never saw, reviewed, or clicked through any Terms of Service.

Mr. Johnson's claims center on the Maker Defendants' negligent and fraudulent maintenance of the new Dai System, not the old Sai System.  On March 12, 2020, after the price

---

[38] "[T]he party seeking to compel arbitration, must prove the existence of a valid agreement by a preponderance of the evidence." *Huuuge, Inc.*, 944 F.3d at 1219.

Opposition to Motion to Compel Arbitration

of Ethereum dropped, Mr. Johnson's Vault – *under the Dai platform* – was sent to auction.   And Mr. Johnson signed up for that system on November 19, 2019, *at the Maker Defendants' urging*. When Mr. Johnson signed up for his Vault, Mr. Johnson was NOT required to click "I agree;" he was not required to click "I acknowledge reading these terms;" and he was not required to review any terms of service.

Instead, Mr. Johnson signed up for the Dai System through a third-party application, instadapp.io.  When doing so, he was not directed to the "Terms of Service;" he was not directed to any reference to those "Terms of Service;" he was certainly not directed to any "arbitration clause;" and he was not directed to any clickwrap agreement.  Again, the Maker Defendants themselves, in a publicly available Risk Meeting, acknowledged that third-party interfaces like that used by Mr. Johnson did not include or require acknowledgement or receipt of any of Defendants' materials.[39]

We have provided above a link to a video that demonstrates for the Court the process of sighing up for a Vault under the new Dai System that reflects the process Mr. Johnson used himself.  We invite the Court to review this demonstration, as it allows the Court to view for itself that at no point during the sign-up/migration process was Mr. Johnson *ever* presented with the Terms of Service. [40]

Whether Mr. Johnson viewed the Terms of Service in 2018 in connection with signing up for the old Sai System is irrelevant, because as even the Maker Defendants acknowledge, the Dai System was a new product and failure to sign up for it would have resulted in being locked out of the old system that was shut down in May 2020. [41]

In fact, and maybe most importantly, had Mr. Johnson NOT migrated to the Dai System by March 2020 and stubbornly stayed on the old system, he would NOT have suffered a zero-bid

---

[39] *See supra* note 1.

[40] *See supra* note 21.

[41] *See* the MakerDAO Blog, *What to Expect With the Launch of Multi-Collateral Dai*, published on November 8, 2019 (*available at*: https://blog.makerdao.com/what-to-expect-with-the-launch-of-multi-collateral-dai/) (last visited August 16, 2020).

Opposition to Motion to Compel Arbitration

auction.[42]  This fact, perhaps more than any others, highlights the fundamentally different nature of the two systems.

At bottom, Mr. Johnson (1) signed up for a new, improved Dai System (2) at the Maker Defendants' own urging, (3) using a third-party application that (4) the Defendants themselves have acknowledged did not include or require acknowledgement or receipt of any of Defendant Makers' materials.

### III.   The Maker Defendants nevertheless ask the Court to blissfully ignore all their marketing, all their top-down mandates, and all the realities of this switch to the new Dai System and conflate signing up for the prior with signing up for the latter.

For years the Maker Defendants have stressed the advantages of the new Dai System and the advantages of abandoning the Sai System. They penalized users for sticking with the Sai System.  They made users sign up for the Dai System anew, just as if it were a new product on a new platform employing a new currency (which of course it is).  They repeatedly stressed the advantages of their decentralized program.

But of course, now they want the Court to ignore all that.[43]  Now, they ask the Court to equate signing up with the old Sai System with signing up for the new Dai System.  But to argue that signing up for one is to have signed up for is not only disingenuous but is also belied by the Maker Defendants' own statements.

At the risk of beating a dead horse, the Maker Defendants' own public documents and statements establish the following:

- The Maker Defendants abandoned the Sai System;
- They actively encouraged their users to migrate to the new Dai System;
- They repeatedly stressed the advantages of the new Dai System;
- They changed the terminology of the new system to stress its deviation from the

---

[42] *See* Johnson Decl., ¶ 15; *see also supra* notes 32–34.

[43] In fact, the Maker Defendants devote no more than a single, one-sentence footnote to even acknowledging the switch from the old Sai System to the new Dai System.  On page 10 of ECF No. 41, footnote 6, the Maker Defendants write: "In November 2019, the Maker Defendants launched an upgraded version of the platform, called multi-collateral DAI ("MCD"), which permits users to generate DAI with additional collateral types beyond ETH."

Opposition to Motion to Compel Arbitration

- When users migrated to or signed up for the Dai System, they had to sign up anew, without regard or reference to if or when they signed up for the Sai System;

- When migrating to or signing up for the Dai System, users were not required to use the Maker Defendants' own website but could instead use a third-party application to facilitate that transfer;

- Many, if not most, of the third-party applications do not require a user to view the Terms of Service, to be directed to them, and certainly not to ever click an "I agree" button to acknowledge review and receipt;

- They do not even attempt to argue Mr. Johnson viewed or had to view the Terms of Service when he signed up for the Dai System; they focus instead exclusively on whether he did so for the Sai System in 2018.

And of course, remarkably, had Mr. Johnson ignored the constant urging of the Maker Defendants and simply stayed on the Sai System without migrating over to the Dai System, he would not have suffered a zero-bid auction on March 12, 2020 and lost all of his Ethereum.

Equating signing up with the Sai System in 2018 with signing up for the Dai System in 2019 makes no sense.  They were different products that required their users to sign up for each separately and in fact even contained apparently different sets of Terms of Service, as Defendants' own CEO acknowledges there was apparently a 2019-version of the Terms of Service associated with the Dai System. [44]  Using one system on March 12, 2020 meant losing all of one's supposedly protected collateral, while using the other meant avoiding a similar fate. Using one system meant the utilization of only one collateral, while using the other meant utilizing numerous types of collateral.  And using one meant viewing the Terms of Service, while using the other meant no reference to the Terms of Service at all.  These were different products that required different sign-ups and promised a different experience. The Maker Defendants' conflation of the two now is a product of convenience to avoid a lawsuit.  Nothing more.  Undoubtedly, as soon as it makes financial sense for them to do so, the Maker Defendants will return to stressing the divisions between the two platforms, as they've been doing for two years.

---

[44] ECF No. 41-1, at pp. 4-5, Declaration of Steven Becker, paragraph 13.

Opposition to Motion to Compel Arbitration

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

### IV.     The Maker Defendants cannot prove – nor have they even tried to prove – there was an enforceable browsewrap agreement.

Notably, the Maker Defendants have not argued or presented any version of the Terms of Service that they contend was an enforceable browsewrap agreement; they focus instead on the 2018 Terms of Service that they contend was a clickwrap agreement  Even if they could – which they cannot – and even if they weren't precluded from doing so now – they failed to address any argument in their motion and cannot do so now, the argument would still be a dead letter because there is no way to show or prove Mr. Johnson was on notice of any set of Terms of Service when he signed up in 2019 for the Dai System.  Because affirmative consent is not required for a browsewrap agreement, the determination of its validity depends on whether the user had (i) actual or (ii) constructive knowledge. *Nguyen*, 763 F.3d at 1176.

A party seeking to prove the existence of an arbitration agreement – i.e., the Maker Defendants – must show evidence of actual knowledge and cannot rely on suggestions or inferences. *See Huuuge*, 944 F.3d at 1219-20.  In other words, the Maker Defendants have the burden of proof to show Mr. Johnson was on notice of a browsewrap agreement.  But again, the Maker Defendants do not identify ANY terms of service for the Dai System that they contend Mr. Johnson viewed or clicked agreement, focusing instead on the sign-up process for the Sai System in 2018.  And as Mr. Johnson has demonstrated, when he signed up for the Dai System, he was not presented with any Terms of Service.  There is no argument or suggestion or proof that he was on notice, constructive or otherwise, of any Terms of Service for the Dai System.

The Maker Defendants hang their argument for compelling arbitration on the premise that the "Terms of Service" were a clickwrap agreement.  Should their premise be wrong – as Mr. Johnson asserts it is – then their motion can be disposed of and there is no need for the Court to address whether the Terms of Service are otherwise enforceable against Mr. Johnson as a browsewrap agreement.  And for the reasons outlined above, any such argument would be irrelevant and meritless in any event because the Maker Defendants do not argue or otherwise identify any separate agreement or Terms of Service connected to the Dai System.  Nevertheless,

Opposition to Motion to Compel Arbitration

to the extent the Maker Defendants attempt to somehow argue the existence or enforceability of a browsewrap agreement in their Reply Brief, Mr. Johnson respectfully requests the Court either (1) strike it or (2) allow Plaintiff a chance to provide additional briefing on that point. *See Burnham v. City of Ronert Park*, No. C 92-1439 SC, 1992 U.S. Dist. Lexis 8540, at *2 n.2 (N.D. Ca. May 18, 1992) ("[R]eply briefs are limited in scope to matters either raised by the opposition or unforeseen at the time of the original motion.").

## V. Consequently, the question of arbitrability is to be decided by this Court, not an arbitrator.

If the Court finds there was no clickwrap agreement and thus no mutual assent to the Terms of Service, then the Court can consequently ignore the balance of the Maker Defendants' arguments. If there was no assent to the arbitration clause, then there is no question the Court can determine the question of arbitrability. The Maker Defendants' entire argument that an arbitrator, not the Court, should make that determination hinges on an assumption that the parties agreed to a valid, enforceable arbitration agreement. As Defendant terms it, "*if* the Court finds that a valid arbitration agreement exists, the arbitrator must decide any remaining question regarding the scope of the arbitration agreement. ECF No. 41, at p. 16 (emphasis added) (quoting *Cordas*, 228 F. Supp. 3d at 992 ("Because the parties agreed to arbitrate . . . and agreed to delegate questions of arbitrability to an arbitrator, the remaining questions of whether the arbitration agreement is valid and whether it encompasses this dispute are delegated to an arbitrator.")).

And so, where the parties have NOT agreed to arbitrate – as is the case here – then the argument falls apart. Indeed, how could the parties have delegated to an arbitrator the question of arbitrability when the parties never entered into a binding contract in the first place?[45]

---

[45] Further, the Maker Defendants cite outdated case law to support their argument that an arbitrator should decide arbitrability. It is true that since 2015, the Ninth Circuit's *Brennan* opinion signaled a change in the status quo and ruled that an agreement expressly incorporating the AAA Rules by reference amount to a clear and unmistakable delegation of authority that the arbiter gets to decide if the case is arbitrable. *Brennan v. Opus Bank*, 796 F.3d 1125 (9th Cir. 2015). But since that time, there has formed a split in Ninth Circuit District Courts about whether incorporating the AAA Rules by references applies to unsophisticated parties, as Mr. Johnson no doubt is vis-à-vis the Maker Defendants. *Compare Zenelaj v. Handybook Inc.*, 82 F. Supp. 3d 968, 973 (N.D. Cal. 2015) (referencing

Opposition to Motion to Compel Arbitration

**CONCLUSION**

*Allegatio contra factum non est admittenda*

An allegation contrary to a deed is not to be heard.

And yet that is what the Maker Defendants have done here.  They ask the Court to accept their allegations that are contradicted in myriad ways by their own actions.  As the old saying goes, "I can't hear what you're saying because your actions are too loud."  After years of emphasizing the differences in their platforms, encouraging their users to migrate to the new system, requiring their users to abandon the old system, forcing users to sign up anew for the new system, admitting that the new system did not require assent to the Terms of Service, they now want the Court to ignore and forget all that.  And why not?  Life would be much easier if they could simply ignore those realities and enforce a 2018 contract that they have abandoned and that is no longer relevant to users today.  They cannot have their cake and eat it too. And Mr. Johnson respectfully requests the Court deny their Motion to Compel Arbitration.


DATED:  August 17, 2020                    **HARRIS BERNE CHRISTENSEN LLP**

                                           By:___/s/ Adam S. Heder_____
                                                Adam S. Heder, CSB #270946
                                                Of Attorneys for Plaintiff PETER JOHNSON,
                                                individually and on behalf of all others similarly
                                                situated

---

"[n]early every subsequent decision in the Northern District of California, which has consistently found effective delegation of arbitrability regardless of the sophistication of the parties") (citations omitted) *with Eiess v. USAA Fed. Sav. Bank*, 404 F. Supp. 3d 1240, 1253 (N.D. Cal. 2019) ("In the wake of *Brennan*, there has been a split among the district courts in the Ninth Circuit as to whether the sophistication of the parties is a relevant consideration in determining whether incorporation by reference of arbitration rules amounts to a clear and unmistakable delegation. . . .  However, the majority of the lower courts in the Ninth Circuit have 'held that incorporation of the AAA rules was insufficient to establish delegation in consumer contracts involving at least one unsophisticated party.'" (citations omitted)).

Opposition to Motion to Compel Arbitration